Mr. Chief Justice Warren
delivered the opinion of the Court.
Involved in these cases are an appeal and two cross-appeals from a decision of the Federal District Court for the Middle District of Alabama holding invalid, under *669 the Equal Protection Clause of the Federal Constitution, the existing and two legislatively proposed plans for the apportionment of seats in the two houses of the Alabama Legislature, and ordering into effect a temporary reapportionment plan comprised of parts of the proposed but judicially disapproved measures.[1]
I.
On August 26, 1961, the original plaintiffs (appellees in No. 23), residents, taxpayers and voters of Jefferson County, Alabama, filed a complaint in the United States District Court for the Middle District of Alabama, in their own behalf and on behalf of all similarly situated Alabama voters, challenging the apportionment of the Alabama Legislature. Defendants below (appellants in No. 23), sued in their representative capacities, were various state and political party officials charged with the performance of certain duties in connection with state elections.[2] The complaint alleged a deprivation of rights under the Alabama Constitution and under the Equal Protection Clause of the Fourteenth Amendment, and asserted that the District Court had jurisdiction under provisions of the Civil Rights Act, 42 U. S. C. §§ 1983, 1988, as well as under 28 U. S. C. § 1343 (3).
The complaint stated that the Alabama Legislature was composed of a Senate of 35 members and a House of Representatives of 106 members. It set out relevant portions of the 1901 Alabama Constitution, which prescribe the number of members of the two bodies of the *670 State Legislature and the method of apportioning the seats among the State’s 67 counties, and provide as follows:
Art. IV, Sec. 50. “The legislature shall consist of not more than thirty-five senators, and not more than one hundred and five members of the house of representatives, to be apportioned among the several districts and counties, as prescribed in this Constitution; provided that in addition to the above number of representatives, each new county hereafter created shall be entitled to one representative.”
Art. IX, Sec. 197. “The whole number of senators shall be not less than one-fourth or more than one-third of the whole number of representatives.”
Art. IX, Sec. 198. “The house of representatives shall consist of not more than one hundred and five members, unless new counties shall be created, in which event each new county shall be entitled to one representative. The members of the house of representatives shall be apportioned by the legislature among the several counties of the state, according to the number of inhabitants in them, respectively, as ascertained by the decennial census of the United States, which apportionment, when made, shall not be subject to alteration until the next session of the legislature after the next decennial census of the United States shall have been taken.”
Art. IX, Sec. 199. “It shall be the duty of the legislature at its first session after the taking of the decennial census of the United States in the year nineteen hundred and ten, and after each subsequent decennial census, to fix by law the number of representatives and apportion them among the several counties of the state, according to the number of inhabitants in them, respectively; provided, that *671 each county shall be entitled to at least one representative.”
Art. IX, Sec. 200. “It shall be the duty of the legislature at its first session after taking of the decennial census of the United States in the year nineteen hundred and ten, and after each subsequent decennial census, to fix by law the number of senators, and to divide the state into as many senatorial districts as there are senators, which districts shall be as nearly equal to each other in the number of inhabitants as may be, and each shall be entitled to one senator, and no more; and such districts, when formed, shall not be changed until the next apportioning session of the legislature, after the next decennial census of the United States shall have been taken; provided, that counties created after the next preceding apportioning session of the legislature may be attached to senatorial districts. No county shall be divided between two districts, and no district shall be made up of two or more counties not contiguous to each other.”
Art. XVIII, Sec. 284. “. . . Representation in the legislature shall be based upon population, and such basis of representation shall not be changed by constitutional amendments.”
The maximum size of the Alabama House was increased from 105 to 106 with the creation of a new county in 1903, pursuant to the constitutional provision which states that, in addition to the prescribed 105 House seats, each county thereafter created shall be entitled to one representative. Article IX, §§ 202 and 203, of the Alabama Constitution established precisely the boundaries of the State’s senatorial and representative districts until the enactment of a new reapportionment plan by the legislature. These 1901 constitutional provisions, specifically describing the composition of the senatorial *672 districts and detailing the number of House seats allocated to each county, were periodically enacted as statutory measures by the Alabama Legislature, as modified only by the creation of an additional county in 1903, and provided the plan of legislative apportionment existing at the time this litigation was commenced.[3]
Plaintiffs below alleged that the last apportionment of the Alabama Legislature was based on the 1900 federal census, despite the requirement of the State Constitution that the legislature be reapportioned decennially. They asserted that, since the population growth in the State from 1900 to 1960 had been uneven, Jefferson and other counties were now victims of serious discrimination with respect to the allocation of legislative representation. As a result of the failure of the legislature to reapportion itself, plaintiffs asserted, they were denied “equal suffrage in free and equal elections . . . and the equal protection of the laws” in violation of the Alabama Constitution and the Fourteenth Amendment to the Federal Constitution. The complaint asserted that plaintiffs had no other adequate remedy, and that they had exhausted all forms of relief other than that available through the federal courts. They alleged that the Alabama Legislature had established a pattern of prolonged inaction from 1911 to the present which “clearly demonstrates that no reapportionment . . . shall be effected”; that representation at any future constitutional convention would be established by the legislature, making it unlikely that the membership of any such convention would be fairly representative; and that, while the Alabama Supreme Court had found that the legislature had not complied with the State Constitution in failing to reapportion according *673 to population decennially,[4] that court had nevertheless indicated that it would not interfere with matters of legislative reapportionment.[5]
Plaintiffs requested that a three-judge District Court be convened.[6] With respect to relief, they sought a declaration that the existing constitutional and statutory provisions, establishing the present apportionment of seats in the Alabama Legislature, were unconstitutional under the Alabama and Federal Constitutions, and an injunction against the holding of future elections for legislators until the legislature reapportioned itself in accordance. with the State Constitution. They further requested the issuance of a mandatory injunction, effective until such time as the legislature properly reapportioned, requiring the conducting of the 1962 election for legislators at large over the entire State, and any other relief which “may seem just, equitable and proper.”
A three-judge District Court was convened, and three groups of voters, taxpayers and residents of Jefferson, Mobile, and Etowah Counties were permitted to inter *674 vene in the action as intervenor-plaintiffs. Two of the groups are cross-appellants in Nos. 27 and 41. With minor exceptions, all of the intervenors adopted the allegations of and sought the same relief as the original plaintiffs.
On March 29, 1962, just three days after this Court had decided Baker v. Carr, 369 U. S. 186, plaintiffs moved for a preliminary injunction requiring defendants to conduct at large the May 1962 Democratic primary election and the November 1962 general election for members of the Alabama Legislature. The District Court set the motion for hearing in an order stating its tentative views that an injunction was not required before the May 1962 primary election to protect plaintiffs’ constitutional rights, and that the Court should take no action which was not “absolutely essential” for the protection of the asserted constitutional rights before the Alabama Legislature had had a “further reasonable but prompt opportunity to comply with its duty” under the Alabama Constitution.
On April 14, 1962, the District Court, after reiterating the views expressed in its earlier order, reset the case for hearing on July 16, noting that the importance of the case, together with the necessity for effective action within a limited period of time, required an early announcement of its views. 205 F. Supp. 245. Relying on our decision in Baker v. Carr, the Court found jurisdiction, justiciability and standing. It stated that it was taking judicial notice of the facts that there had been population changes in Alabama’s counties since 1901, that the present representation in the State Legislature was not on a population basis, and that the legislature had never reapportioned its membership as required by the Alabama Constitution.[7] Continuing, the Court stated *675 that if the legislature complied with the Alabama constitutional provision requiring legislative representation to be based on population there could be no objection on federal constitutional grounds to such an apportionment. The-Court further indicated that, if the legislature failed to act, or if its actions did not meet constitutional standards, it would be under a “clear duty” to take some action on the matter prior to the November 1962 general election. The District Court stated that its “present thinking” was to follow an approach suggested by MR. Justice Clark in his concurring opinion in Baker v. Carr[8]— awarding seats released by the consolidation or revamping of existing districts to counties suffering “the most egregious discrimination,” thereby releasing the strangle hold on the legislature sufficiently so as to permit the newly elected body to enact a constitutionally valid and permanent reapportionment plan, and allowing eventual dismissal of the case. Subsequently, plaintiffs were permitted to amend their complaint by adding a further prayer for relief, which asked the District Court to reapportion the Alabama Legislature provisionally so that the rural strangle hold would be relaxed enough to permit it to reapportion itself.
On July 12, 1962, an extraordinary session of the Alabama Legislature adopted two reapportionment plans to take effect for the 1966 elections. One was a proposed constitutional amendment, referred to as the “67-Senator Amendment.” [9] It provided for a House of Representatives consisting of 106 members, apportioned by giving *676 one seat to each of Alabama’s 67 counties and distributing the others according to population by the “equal proportions” method.[10] Using this formula, the constitutional amendment specified the number of representatives allotted to each county until a new apportionment could be made on the basis of the 1970 census. The Senate was to be composed of 67 members, one from each county. The legislation provided that the proposed amendment should be submitted to the voters for ratification at the November 1962 general election.
The other reapportionment plan was embodied in a statutory measure adopted by the legislature and signed into law by the Alabama Governor, and was referred to as the “Crawford-Webb Act.”[11] It was enacted as standby legislation to take effect in 1966 if the proposed constitutional amendment should fail of passage by a majority of the State’s voters, or should the federal courts refuse to accept the proposed amendment (though not rejected by the voters) as effective action in compliance with the requirements of the Fourteenth Amendment. The act provided for a Senate consisting of 35 members, representing 35 senatorial districts established along county lines, and altered only a few of the former districts. In apportioning the 106 seats in the Alabama House of Representatives, the statutory measure gave each county one seat, and apportioned the remaining 39 on a rough population basis, under a formula requiring increasingly more population for a county to be accorded *677 additional seats. The Crawford-Webb Act also provided that it would be effective “until the legislature is reapportioned according to law,” but provided no standards for such a reapportionment. Future apportionments would presumably be based on the existing provisions of the Alabama Constitution which the statute, unlike the proposed constitutional amendment, would not affect.
The evidence adduced at trial before the three-judge panel consisted primarily of figures showing the population of each Alabama county and senatorial district according to the 1960 census, and the number of representatives allocated to each county under each of the three plans at issue in the litigation — the existing apportionment (under the 1901 constitutional provisions and the current statutory measures substantially reenacting the same plan), the proposed 67-Senator constitutional amendment, and the Crawford-Webb Act. Under all three plans, each senatorial district would be represented by only one senator.
On July 21, 1962, the District Court held that the inequality of the existing representation in the Alabama Legislature violated the Equal Protection Clause of the Fourteenth Amendment, a finding which the Court noted had been “generally conceded” by the parties to the litigation, since population growth and shifts had converted the 1901 scheme, as perpetuated some 60 years later, into an invidiously discriminatory plan completely lacking in rationality. 208 F. Supp. 431. Under the existing provisions, applying i960 census figures, only 25.1% of the State’s total population resided in districts represented by a majority of the members of the Senate, and only 25.7% lived in counties which could elect a majority of the members of the House of Representatives. Population-variance ratios of up to about 41-to-l existed in the Senate, and up to about 16-to-l in the House. Bullock County, with a population of only 13,462, and Henry County, with a population of only 15,286, each were allocated two seats *678 in the Alabama House, whereas Mobile County, with a population of 314,301, was given only three seats, and Jefferson County, with 634,864 people, had only seven representatives.[12] With respect to senatorial apportionment, since the pertinent Alabama constitutional provisions had been consistently construed as prohibiting the giving of more than one Senate seat to any one county,[13] Jefferson County, with over 600,000 people, was given only one senator, as was Lowndes County, with a 1960 population of only 15,417, and Wilcox County, with only 18,739 people.[14]
The Court then considered both the proposed constitutional amendment and the Crawford-Webb Act to ascer *679 tain whether the legislature had taken effective action to remedy the unconstitutional aspects of the existing apportionment. In initially summarizing the result which it had reached, the Court stated:
“This Court has reached the conclusion that neither the ‘67-Senator Amendment/ nor the ‘Crawford-Webb Act’ meets the necessary constitutional requirements. We find that each of the legislative acts, when considered as a whole, is so obviously discriminatory, arbitrary and irrational that it becomes unnecessary to pursue a detailed development of each of the relevant factors of the [federal constitutional] test.” [15]
The Court stated that the apportionment of one senator to each county, under the proposed constitutional amendment, would “make the discrimination in the Senate even more invidious than at present.” Under the 67-Senator Amendment, as pointed out by the court below, “[t]he present control of the Senate by members representing 25.1% of the people of Alabama would be reduced to control by members representing 19.4% of the people of the State,” the 34 smallest counties, with a total population of less than that of Jefferson County, would have a majority of the senatorial seats, and senators elected by only about 14% of the State’s population could prevent the submission to the electorate of any future proposals to amend the State Constitution (since a vote of two-fifths of the members of one house can defeat a proposal to amend the Alabama Constitution). Noting that the “only conceivable rationalization” of the senatorial apportionment scheme is that it was based on equal representation of political subdivisions within the State and is thus analogous to the Federal Senate, the District Court rejected the analogy on the ground that Alabama *680 counties are merely involuntary political units of the State created by statute to aid in the administration of state government. In finding the so-called federal analogy irrelevant, the District Court stated:
“The analogy cannot survive the most superficial examination into the history of the requirement of the Federal Constitution and the diametrically opposing history of the requirement of the Alabama Constitution that representation shall be based on population. Nor can it survive a comparison of the different political natures of states and counties.” [16]
The Court also noted that the senatorial apportionment proposal “may not have complied with the State Constitution,” since not only is it explicitly provided that the population basis of legislative representation “shall not be changed by constitutional amendments,” [17] but the Alabama Supreme Court had previously indicated that that requirement could probably be altered only by constitutional convention.[18] The Court concluded, however, that the apportionment of seats in the Alabama House, under the proposed constitutional amendment, was “based upon reason, with a rational regard for known and accepted *681 standards of apportionment.” [19] Under the proposed apportionment of representatives, each of the 67 counties was given one seat and the remaining 39 were allocated on a population basis. About 43% of the State’s total population would live in counties which could elect a majority in that body. And, under the provisions of the 67-Senator Amendment, while the maximum population-variance ratio was increased to about 59-to-l in the Senate, it was significantly reduced to about 4.7-to-l in the House of Representatives. Jefferson County was given 17 House seats, an addition of 10, and Mobile County was allotted eight, an increase of five. The increased representation of the urban counties was achieved primarily by limiting the State’s 55 least populous counties to one House seat each, and the net effect was to take 19 seats away from rural counties and allocate them to the more populous counties. Even so, serious disparities from a population-based standard remained. Montgomery County, with 169,210 people, was given only four seats, while Coosa County, with a population of only 10,726, and Cleburne County, with only 10,911, were each allocated one representative.
Turning next to the provisions of the Crawford-Webb Act, the District Court found that its apportionment of the 106 seats in the Alabama House of Representatives, by allocating one seat to each county and distributing the remaining 39 to the more populous counties in diminishing ratio to their populations, was “totally unacceptable.” [20] Under this plan, about 37% of the State’s total *682 population would reside in counties electing a majority of the members of the Alabama House, with a maximum population-variance ratio of about 5-to-l. Each representative from Jefferson and Mobile Counties would represent over 52,000 persons while representatives from eight rural counties would each represent less than 20,000 people. The Court regarded the senatorial apportionment provided in the Crawford-Webb Act as “a step in the right direction, but an extremely short step,” and but a “slight improvement over the present system of representation.” [21] The net effect of combining a few of the less populous counties into two-county, districts and splitting up several of the larger districts into smaller ones would be merely to increase the minority which would be represented by a majority of the members of the Senate from 25.1% to only 27.6% of the State’s population.[22] The Court pointed out that, under the Crawford-Webb Act, the vote of a person in the senatorial district consisting of Bibb and Perry Counties would be worth 20 times that of a citizen in Jefferson County, and that the vote of a citizen in the six smallest districts would be worth 15 or more times that of a Jefferson County voter. The Court concluded that the Crawford- *683 Webb Act was “totally unacceptable” as a “piece of permanent legislation” which, under the Alabama Constitution, would have remained in effect without alteration at least until after the next decennial census.
Under the detailed requirements of the various constitutional provisions relating to the apportionment of seats in the Alabama Senate and House of Representatives, the Court found, the membership of neither house can be apportioned solely on a population basis, despite the provision in Art. XVIII, § 284, which states that “ [r] epresentation in the legislature shall be based upon population.” In dealing with the conflicting and somewhat paradoxical requirements (under which the number of seats in the House is limited to 106 but each of the 67 counties is required to be given at least one representative, and the size of the Senate is limited to 35 but it is required to have at least one-fourth of the members of the House, although no county can be given more than one senator), the District Court stated its view that “the controlling or dominant provision of the Alabama Constitution on the subject of representation in the Legislature” is the previously referred to language of § 284. The Court stated that the detailed requirements of Art. IX, §§ 197-200,
“make it obvious that in neither the House nor the Senate can representation be based strictly and entirely upon population. . . . The result may well be that representation according to population to some extent must be required in both Houses if invidious discrimination in the legislative systems as a whole is to be avoided. Indeed, ... it is the policy and theme of the Alabama Constitution to require representation according to population in both Houses as nearly as may be, while still complying with more detailed provisions.” [23]
*684 The District Court then directed its concern to the providing of an effective remedy. It indicated that it was adopting and ordering into effect for the November 1962 election a provisional and temporary reapportionment plan composed of the provisions relating to the House of Representatives contained in the 67-Senator Amendment and the provisions of the Crawford-Webb Act relating to the Senate. The Court noted, however, that “[t]he proposed reapportionment of the Senate in the ‘Crawford-Webb Act/ unacceptable as a piece of permanent legislation, may not even break the strangle hold.” Stating that it was retaining jurisdiction and deferring any hearing on plaintiffs’ motion for a permanent injunction “until the Legislature, as provisionally reapportioned . . . , has an opportunity to provide for a true reapportionment of both Houses of the Alabama Legislature,” the Court emphasized that its “moderate” action was designed to break the strangle hold by the smaller counties on the Alabama Legislature and would not suffice as a permanent reapportionment. On July 25, 1962, the Court entered its decree in accordance with its previously stated determinations, concluding that “plaintiffs . . . are denied . . . equal protection ... by virtue of the debasement of their votes since the Legislature of the State of Alabama has failed and continues to fail to reapportion itself as required by law.” It enjoined the defendant state officials from holding any future elections under any of the apportionment plans that it had found invalid, and stated that the 1962 election of Alabama legislators could validly be conducted only under the apportionment scheme specified in the Court’s order.
After the District Court’s decision, new primary elections were held pursuant to legislation enacted in 1962 at the same special session as the proposed constitutional amendment and the Crawford-Webb Act, to be effective *685 in the event the Court itself ordered a particular reapportionment plan into immediate effect. The November 1962 general election was likewise conducted on the basis of the District Court’s ordered apportionment of legislative seats, as Mr. Justice Black refused to stay the District Court’s order. Consequently, the present Alabama Legislature is apportioned in accordance with the temporary plan prescribed by the District Court’s decree. All members of both houses of the Alabama Legislature serve four-year terms, so that the next regularly scheduled election of legislators will not be held until 1966. The 1963 regular session of the Alabama Legislature produced no legislation relating to legislative apportionment,[24] and the legislature, which meets biennially, will not hold another regular session until 1965.
No effective political remedy to obtain relief against the alleged malapportionment of the Alabama Legislature appears to have been available.[25] No initiative procedure exists under Alabama law. Amendment of the State Constitution can be achieved only after a proposal is adopted by three-fifths of the members of both houses of the legislature and is approved by a majority of the people,[26] or as a result of a constitutional convention convened *686 after approval by the people of a convention call initiated by a majority of both houses of the Alabama Legislature.[27]
Notices of appeal to this Court from the District Court’s decision were timely filed by defendants below (appellants in No. 23) and by two groups of intervenor-plain-tiffs (cross-appellants in Nos. 27 and 41). Appellants in No. 23 contend that the District Court erred in holding the existing and the two proposed plans for the apportionment of seats in the Alabama Legislature unconstitutional, and that a federal court lacks the power to affirmatively reapportion seats in a state legislature. Cross-appellants in No. 27 assert that the court below erred in failing to compel reapportionment of the Alabama Senate on a population basis as allegedly required by the Alabama Constitution and the Equal Protection Clause of the Federal Constitution. Cross-appellants in No. 41 contend that the District Court should have required and ordered into effect the apportionment of seats in both houses of the Alabama Legislature on a population basis. We noted probable jurisdiction on June 10, 1963. 374 U. S. 802.
II.
Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. A consistent line of decisions by this Court in cases involving attempts to deny or restrict the right of suffrage has made this indelibly clear. It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, Ex parte Yarbrough, 110 U. S. 651, and to have their votes counted, United States v. Mosley, 238 U. S. 383. In Mosley the Court stated that it is “as equally unquestionable that the right to have one’s vote counted is as open to protection ... as the right to put a ballot in a box.” 238 U. S., *687 at 386. The right to vote can neither be denied outright, Guinn v. United States, 238 U. S. 347, Lane v. Wilson, 307 U. S. 268, nor destroyed by alteration of ballots, see United States v. Classic, 313 U. S. 299, 315, nor diluted by ballot-box stuffing, Ex parte Siebold, 100 U. S. 371, United States v. Saylor, 322 U. S. 385. As the Court stated in Classic, “Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted . . . 313 U. S., at 315. Racially based gerrymandering, Gomillion v. Lightfoot, 364 U. S. 339, and the conducting of white primaries, Nixon v. Herndon, 273 U. S. 536, Nixon v. Condon, 286 U. S. 73, Smith v. Allwright, 321 U. S. 649, Terry v. Adams, 345 U. S. 461, both of which result in denying to some citizens their right to vote, have been held to be constitutionally impermissible. And history has seen a continuing expansion of the scope of the right of suffrage in this country.[28] The right to vote freely for the candidate of one’s choice'''is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen’s vote just as effectively as by wholly prohibiting the free exercise of the franchise.[29]
*688 In Baker v. Carr, 369 U. S. 186, we held that a claim asserted under the Equal Protection Clause challenging the constitutionality of a State’s apportionment of seats in its legislature, on the ground that the right to vote of certain citizens was effectively impaired since debased and diluted, in effect presented a justiciable controversy subject to adjudication by federal courts. The spate of similar cases filed and decided by lower courts since our decision in Baker amply shows that the problem of state legislative malapportionment is one that is perceived to exist in a large number of the States.[30] In Baker, a suit involving an attack on the apportionment of seats in the Tennessee Legislature, we remanded to the District Court, which had dismissed the action, for consideration on the merits. We intimated no view as to the proper constitutional standards for evaluating the validity of a state legislative apportionment scheme. Nor did we give any consideration to the question of appropriate remedies. Rather, we simply stated:
“Beyond noting that we have no cause at this stage to doubt the District Court will be able to fashion relief if violations of constitutional rights are found, it is improper now to consider what remedy would be most appropriate if appellants prevail at the trial.”[31]
*689 We indicated in Baker, however, that the Equal Protection Clause provides discoverable and manageable standards for use by lower courts in determining the constitutionality of a state legislative apportionment scheme, and we stated:
“Nor need the appellants, in order to succeed in this action, ask the Court to enter upon policy determinations for which judicially manageable standards are lacking. Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects no policy, but simply arbitrary and capricious action.” [32]
Subsequent to Baker, we remanded several cases to the courts below for reconsideration in light of that decision.[33]
In Gray v. Sanders, 372 U. S. 368, we held that the Georgia county unit system, applicable in statewide primary elections, was unconstitutional since it resulted in a dilution of the weight of the votes of certain Georgia voters merely because of where they resided. After indicating that the Fifteenth and Nineteenth Amendments prohibit a State from overweighting or diluting votes on the basis of race or sex, we stated :
“How then can one person be given twice or ten times the voting power of another person in a statewide election merely because he lives in a rural area or because he lives in the smallest rural county? Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote — whatever their race, whatever their sex, whatever their occu *690 pation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment. The concept of ‘we the people’ under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications. The idea that every voter is equal to every other voter in his State, when he casts his ballot hrfavor of one of several competing candidates, underlies many of our decisions.” [34]
Continuing, we stated that “there is no indication in the Constitution that homesite or occupation affords a permissible basis for distinguishing between qualified voters within the State.” And, finally, we concluded: “The conception of political equality from the Declaration of Independence, to Lincoln’s Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing — one person, one vote.”[35]
We stated in Gray, however, that that case,
“unlike Baker v. Carr, . . . does not involve a question of the degree to which the Equal Protection Clause of the Fourteenth Amendment limits the authority of a State Legislature in designing the geographical districts from which representatives are chosen either for the State Legislature or for the Federal House of Representatives. . . . Nor does it present the question, inherent in the bicameral form of our Federal Government, whether a State may have one house chosen without regard to population.” [36]
*691 Of course, in these cases we are faced with the problem not presented in Gray — that of determining the basic standards and stating the applicable guidelines for implementing our decision in Baker v. Carr.
In Wesberry v. Sanders, 376 U. S. 1, decided earlier this Term, we held that attacks on the constitutionality of congressional districting plans enacted by state legislatures do not present non justiciable questions and should not be dismissed generally for “want of equity.” We determined that the constitutional test for the validity of congressional districting schemes was one of substantial equality of population among the various districts established by a state legislature for the election of members of the Federal House of Representatives.
In that case we decided that an apportionment of congressional seats which “contracts the value of some votes and expands that of others” is unconstitutional, since “the Federal Constitution intends that when qualified voters elect members of Congress each vote be given as much weight as any other vote . . . .” We concluded that the constitutional prescription for election of members of the House of Representatives “by the People,” construed in its historical context, “means that as nearly as is practicable one man’s vote in a congressional election is to be worth as much as another’s.” We further stated:
“It would defeat the principle solemnly embodied in the Great Compromise — equal representation in the House for equal numbers of people — for us to hold that, within the States, legislatures may draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others.” [37]
We found further, in Wesberry, that “our Constitution’s plain objective” was that “of making equal repre *692 sentation for equal numbers of people the fundamental goal . . . .” We concluded by stating:
“No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.” [38]
Gray and Wesberry are of course not dispositive of or directly controlling on our decision in these cases involving state legislative apportionment controversies. Admittedly, those decisions, in which we held that, in statewide and in congressional elections, one person’s vote must be counted equally with those of all other voters in a State, were based on different constitutional considerations and were addressed to rather distinct problems. But neither are they wholly inapposite. Gray, though not determinative here since involving the weighting of votes in .statewide elections, established the basic principle of equality among voters within a State, and held that voters cannot be classified, constitutionally, on the basis of where they live, at least with respect to voting in statewide elections. And our decision in Wes-berry was of course grounded on that language of the Constitution which prescribes that members of the Federal House of Representatives are to be chosen “by the People,” while attacks on state legislative apportionment schemes, such as that involved in the instant cases, are principally based on the Equal Protection Clause of the Fourteenth Amendment. Nevertheless, Wesberry clearly established that the fundamental principle of rep-sentative government in this country is one of equal *693 representation for equal numbers of people, without regard to race, sex, economic status, or place of residence within a State. Our problem, then, is to ascertain, in the instant cases, whether there are any constitutionally cognizable principles which would justify departures from the basic standard of equality among voters in the apportionment of seats in state legislatures.
III.
A predominant consideration in determining whether a State’s legislative apportionment scheme constitutes an invidious discrimination violative of rights asserted under the Equal Protection Clause is that the rights allegedly impaired are individual and personal in nature. As stated by the Court in United States v. Bathgate, 246 U. S. 220, 227, “[t]he right to vote is personal [39] While the result of a court decision in a state legislative apportionment controversy may be to require the restructuring of the geographical distribution of seats in a state legislature, the judicial focus must be concentrated upon ascertaining whether there has been any discrimination against certain of the State’s citizens which constitutes an impermissible impairment of their constitutionally protected right to vote. Like Skinner v. Oklahoma, 316 U. S. 535, such a case “touches a sensitive and important area of human rights,” and “involves one of the basic civil rights of man,” presenting questions of alleged “invidious discriminations . . . against groups or types of individuals in violation of the constitutional guaranty of just and equal laws.” 316 U. S., at 536, 541. Undoubtedly, the right of suffrage is a fundamental mat *694 ter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized. Almost a century ago, in Yick Wo v. Hopkins, 118 U. S. 356, the Court referred to “the political franchise of voting” as “a fundamental political right, because preservative of all rights.” 118 U. S., at 370.
Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests. As long as ours is a representative form of government, and our legislatures are those instruments of government elected directly by and directly representative of the people, the right to elect legislators in a free and unimpaired fashion is a bedrock of our political system. It could hardly be gainsaid that a constitutional claim had been asserted by an allegation that certain otherwise qualified voters had been entirely prohibited from voting for members of their state legislature. And, if a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or 10 times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted. It would appear extraordinary to suggest that a State could be constitutionally permitted to enact a law providing that certain of the State’s voters could vote two, five, or 10 times for their legislative representatives, while voters living elsewhere could vote only once. And it is inconceivable that a state law to the effect that, in counting votes for legislators, the votes of citizens in one part of the State would be multiplied by two, five, or 10, while the votes of persons in another area would be counted only at face value, could be constitutionally sustainable. ! Óf course, the effect of *695 state legislative districting schemes which give the same number of representatives to unequal numbers of constituents is identical.[40]J Overweighting and overvaluation of the votes of those living here has the certain effect of dilution and undervaluation of the votes of those living there. The resulting discrimination against those individual voters living in disfavored areas is easily demonstrable mathematically. Their right to vote is simply not the same right to vote as that of those living in a favored part of the State. Two, five, or 10 of them must vote before the effect of their voting is equivalent to that of their favored neighbor. Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable. One must be ever aware that the Constitution forbids “sophisticated as well as simple-minded modes of discrimination.” Lane v. Wilson, 307 U. S. 268, 275; Gomillion v. Lightfoot, 364 U. S. 339, 342. As we stated in Wesberry v. Sanders, supra:
“We do not believe that the Framers of the Constitution intended to permit the same vote-diluting discrimination to be accomplished through the device of districts containing widely varied numbers of inhabitants. To say that a vote is worth *696 more in one district than in another would . . . run counter to our fundamental ideas of democratic government . . . .”[41]
State legislatures are, historically, the fountainhead of representative government in this country. A number of them have their roots in colonial times, and substantially antedate the creation of our Nation and our Federal Government. In fact, the first formal stirrings of American political independence are to be found, in large part, in the views and actions of several of the colonial legislative bodies. With the birth of our National Government, and the adoption and ratification of the Federal *697 Constitution, state legislatures retained a most important place in our Nation’s governmental structure. But representative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State’s legislative bodies. Most citizens can achieve this participation only as qualified voters through the election of legislators to represent them. Full and effective participation by all citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his state legislature. Modern and viable state government needs, and the Constitution demands, no less.
Logically, in a society ostensibly grounded on representative government, it would seem reasonable that a majority of the people of a State could elect a majority of that State’s legislators. To conclude differently, and to sanction minority control of state legislative bodies, would appear to deny majority rights in a way that far surpasses any possible denial of minority rights that might otherwise be thought to result. Since legislatures are responsible for enacting laws by which all citizens are to be governed, they should be bodies which are collectively responsive to the popular will. And the concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged. With respect to the allocation of legislative representation, all voters, as citizens of a State, stand in the same relation regardless of where they live. Any suggested criteria for the differentiation of citizens are insufficient to justify any discrimination, as to the weight of their votes, unless relevant to the permissible purposes of legislative apportionment. ‘“Since the achieving of fair and effective representation for all citi *698 zens is concededly the basic aim of legislative apportionment, we conclude that the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators. Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race, Brown v. Board of Education, 347 U. S. 483, or economic status, Griffin v. Illinois, 351 U. S. 12, Douglas v. California, 372 U. S. 353. Our constitutional system amply provides for the protection of minorities by means other than giving them majority control of state legislatures. And the democratic ideals of equality and majority rule, which have served this Nation so well in the past, are hardly of any less significance for the present and the future.
We are told that the matter of apportioning representation in a state legislature is a complex and many-faceted one. We are advised that States can rationally consider factors other than population in apportioning legislative representation. We are admonished not to restrict the power of the States to impose differing views as to political philosophy on their citizens. We are cautioned about the dangers of entering into political thickets and mathematical quagmires. Our answer is this: a denial of constitutionally protected rights demands judicial protection ; our oath and our office require no less of us. As stated in Gomillion v. Lightfoot, supra:
“When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.” [42]
*699 To the extent that a citizen’s right to vote is debased, he is that much less a citizen. The fact that an individual lives here or there is not a legitimate reason for over-weighting or diluting the efficacy of his vote. The complexions of societies and civilizations change, often with amazing rapidity. A nation once primarily rural in character becomes predominantly urban.[43] Representation schemes once fair and equitable become archaic and outdated. But the basic principle of representative government remains, and must remain, unchanged — the weight of a citizen’s vote cannot be made to depend on where he lives. Population is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies.[44] *700 A citizen, a qualified voter, is no more nor no less so because lie lives in the city or on the farm. This is the clear and strong command of our Constitution’s Equal Protection Clause. This is an essential part of the concept of a government of laws and not men. This is at the heart of Lincoln’s vision of “government of the people, by the people, [and] for the people.” The Equal Protection Clause demands no less than substantially equal state legislative representation for all citizens, of all places as well as of all races.
IV.
We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. Simply stated, an individual’s right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State. Since, under neither the existing apportionment provisions nor either of the proposed plans was either of the houses of the Alabama Legislature apportioned on a population basis, the District Court correctly held that all three of these schemes were constitutionally invalid. Furthermore, the existing apportionment, and also to a lesser extent the apportionment under the Crawford-Webb Act, presented little more than crazy quilts, completely lacking in rationality, and could be found invalid on that basis alone.[45] Al *701 though the District Court presumably found the apportionment of the Alabama House of Representatives under the 67-Senator Amendment to be acceptable, we conclude that the deviations from a strict population basis are too egregious to permit us to find that that body, under this proposed plan, was apportioned sufficiently on a population basis so as to permit the arrangement to be constitutionally sustained. Although about 43% of the State’s total population would be required to comprise districts which could elect a majority in that body, only 39 of the 106 House seats were actually to be distributed on a population basis, as each of Alabama’s 67 counties was given at least one representative, and population-variance ratios of close to 5-to-l would have existed. While mathematical nicety is not a constitutional requisite, one could hardly conclude that the Alabama House, under the proposed constitutional amendment, had been apportioned sufficiently on a population basis to be sustainable under the requirements of the Equal Protection Clause. And none of the other appor-tionments of seats in either of the bodies of the Alabama Legislature, under the three plans considered by the District Court, came nearly as close to approaching the required constitutional standard as did that of the House of Representatives under the 67-Senator Amendment.
Legislative apportionment in Alabama is signally illustrative and symptomatic of the seriousness of this problem in a number of the States. At the time this litigation was commenced, there had been no reappor *702 tionment of seats in the Alabama Legislature for over 60 years.[46] Legislative inaction, coupled with the unavailability of any political or judicial remedy,[47] had resulted, with the passage of years, in the perpetuated scheme becoming little more than an irrational anachronism. Consistent failure by the Alabama Legislature to comply with state constitutional requirements as to the frequency of reapportionment and the bases of legislative representation resulted in a minority strangle hold on the State Legislature. Inequality of representation in one house added to the inequality in the other. With the crazy-quilt existing apportionment virtually conceded to be invalid, the Alabama Legislature offered two proposed plans for consideration by the District Court, neither of which was to be effective until 1966 and neither of which provided for the apportionment of even one of the two houses on a population basis. We find that the court below did not err in holding that neither of these proposed reapportionment schemes, considered as a whole, “meets the necessary constitutional requirements.” And we conclude that the District Court acted properly in considering these two proposed plans, although neither was to become effective until the 1966 election and the proposed constitutional amendment was scheduled to be submitted to the State’s voters in November 1962.[48] *703 Consideration by the court below of the two proposed plans was clearly necessary in determining whether the Alabama Legislature had acted effectively to correct the admittedly existing malapportionment, and in ascertaining what sort of judicial relief, if any, should be afforded.
V.
Since neither of the houses of the Alabama Legislature, under any of the three plans considered by the District Court, was apportioned on a population basis, we would be justified in proceeding no further. However, one of the proposed plans, that contained in the so-called 67-Senator Amendment, at least superficially resembles the scheme of legislative representation followed in the Federal Congress. Under this plan, each of Alabama’s 67 counties is allotted one senator, and no counties are given more than one Senate seat. Arguably, this is analogous to the allocation of two Senate seats, in the Federal Congress, to each of the 50 States, regardless of population. Seats in the Alabama House, under the proposed constitutional amendment, are distributed by giving each of the 67 counties at least one, with the remaining 39 seats being allotted among the more populous counties on a population basis. This scheme, at least at first glance, appears to resemble that prescribed for the Federal House of Representatives, where the 435 seats are distributed among the States on a population basis, although each State, regardless of its population, is given at least one Congressman. Thus, although there are substantial differences in underlying rationale and result,[49] *704 the 67-Senator Amendment, as proposed by the Alabama Legislature, at least arguably presents for consideration a scheme analogous to that used for apportioning seats in Congress.
Much has been written since our decision in Baker v. Carr about the applicability of the so-called federal analogy to state legislative apportionment arrangements.[50] After considering the matter, the court below concluded that no conceivable analogy could be drawn between the federal scheme and the apportionment of seats in the Alabama Legislature under the proposed con *705 stitutional amendment.[51] We agree with the District Court, and find the federal analogy inapposite and irrelevant to state legislative districting schemes. Attempted reliance on the federal analogy appears often to be little more than an after-the-fact rationalization offered in defense of maladjusted state apportionment arrangements. The original constitutions of 36 of our States provided that representation in both houses of the state legislatures would be based completely, or predominantly, on population.[52] And the Founding Fathers clearly had no intention of establishing a pattern or model for the apportionment of seats in state legislatures when the system of representation in the Federal Congress was adopted.[53] Demonstrative of this is the fact that the Northwest Ordinance, adopted in the same year, 1787, as the Federal Constitution, provided for the apportionment of seats in territorial legislatures solely on the basis of population.[54]
*706 The system of representation in the two Houses of the Federal Congress is one ingrained in our Constitution, as part of the law of the land. It is one conceived out of compromise and concession indispensable to the establishment of our federal republic.[55] Arising from unique historical circumstances, it is based on the consideration that in establishing our type of federalism a group of formerly independent States bound themselves together under one national government. Admittedly, the original 13 States surrendered some of their sovereignty in agreeing to join together “to form a more perfect Union.” But at the heart of our constitutional system remains the concept of separate and distinct governmental entities which have delegated some, but not all, of their formerly held powers to the single national government. The fact that almost three-fourths of our present States were never in fact independently sovereign does not detract from our view that the so-called federal analogy is inapplicable as a sustaining precedent for state legislative apportionments. The developing history and growth of our republic cannot cloud the fact that, at the time of the inception of the system of representation in the Federal Congress, a compromise between the larger and smaller States on this matter averted a deadlock in the Constitutional Convention which had threatened to abort the birth of our Nation. In rejecting an asserted analogy to the federal electoral college in Gray v. Sanders, supra, we stated:
“We think the analogies to the electoral college, to districting and redistricting, and to other phases of the problems of representation in state or federal legislatures or conventions are inapposite. The inclusion of the electoral college in the Constitution, as the result of specific historical concerns, validated the collegiate principle despite its inherent numerical inequality, but implied nothing about the use of *707 an analogous system by a State in a statewide election. No such specific accommodation of the latter was ever undertaken, and therefore no validation of its numerical inequality ensued.” [56]
Political subdivisions of States — counties, cities, or whatever — never were and never have been considered as sovereign entities. Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions. As stated by the Court in Hunter v. City of Pittsburgh, 207 U. S. 161, 178, these governmental units are “created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them,” and the “number, nature and duration of the powers conferred upon [them] . . . and the territory over which they shall be exercised rests in the absolute discretion of the State.” The relationship of the States to the Federal Government could hardly be less analogous.
Thus, we conclude that the plan contained in the 67-Senator Amendment for apportioning seats in the Alabama Legislature cannot be sustained by recourse to the so-called federal analogy. Nor can any other inequitable state legislative apportionment scheme be justified on such an asserted basis. This does not necessarily mean that such a plan is irrational or involves something other than a “republican form of government.” We conclude simply that such a plan is impermissible for the States under the Equal Protection Clause, since perforce resulting, in virtually every case, in submergence of the equal-population principle in at least one house of a state legislature.
Since we find the so-called federal analogy inapposite to a consideration of the constitutional validity of state *708 legislative apportionment schemes, we necessarily hold that the Equal Protection Clause requires both houses of a state legislature to be apportioned on a population basis. The right of a citizen to equal representation and to have his vote weighted equally with those of all other citizens in the election of members of one. house of a bicameral state legislature would amount to little if States could effectively submerge the equal-population principle in the apportionment of seats in the other house. If such a scheme were permissible, an individual citizen’s ability to exercise an effective voice in the only instrument of state government directly representative of the people might be almost as effectively thwarted as if neither house were apportioned on a population basis. Deadlock between the two bodies might result in compromise and concession on some issues. But in all too many cases the more probable result would be frustration of the majority will through minority veto in the house not apportioned on a population basis, stemming directly from the failure to accord adequate overall legislative representation to all of the State’s citizens on a nondiscriminatory basis. In summary, we can perceive no constitutional difference, with respect to the geographical distribution of state legislative representation, between the two houses of a bicameral state legislature.
We do not believe that the concept of bicameralism is rendered anachronistic and meaningless when the predominant basis of representation in the two state legislative bodies is required to be the same — population. A prime reason for bicameralism, modernly considered, is to insure mature and deliberate consideration of, and to prevent precipitate action on,'proposed legislative measures. Simply because the controlling criterion for apportioning representation is required to be the same in both houses does not mean that there will be no differences in the composition and complexion of the two bodies. Different *709 constituencies can be represented in the two houses. One body could be composed of single-member districts while the other could have at least some multimember districts. The length of terms of the legislators in the separate bodies could differ. The numerical size of the two bodies could be made to differ, even significantly, and the geographical size of districts from which legislators are elected could also be made to differ. And apportionment' in one house could be arranged so as to balance off minor inequities in the representation of certain areas in the other house. In summary, these and other factors could be, and are presently in many States, utilized to engender differing complexions and collective attitudes in the two bodies of a state legislature, although both are apportioned substantially on a population basis.
YI.
By holding that as a federal constitutional requisite both houses of a state legislature must be apportioned on a population basis, we mean that the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable. We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement.[57]
In Wesberry v. Sanders, supra, the Court stated that congressional representation must be. based on population as nearly as is practicable. In implementing the basic constitutional principle of representative government as enunciated by the Court in Wesberry — equality of popu *710 lation among districts — some distinctions may well be made between congressional and state legislative representation. Since, almost invariably, there is a significantly larger number of seats in state legislative bodies to be distributed within a State than congressional seats, it may be feasible to use political subdivision lines to a greater extent in establishing state legislative districts than in congressional districting while still affording adequate representation to all parts of the State. To do so would be constitutionally valid, so long as the resulting apportionment was one based substantially on population and the equal-population principle was not diluted in any significant way. Somewhat more flexibility may therefore be constitutionally permissible with respect to state legislative apportionment than in congressional districting. Lower courts can and assuredly will work out more concrete and specific standards for evaluating state legislative apportionment schemes in the context of actual litigation. For the present, we deem it expedient not to attempt to spell out any precise constitutional tests. What is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstances oí the case. Developing a body of doctrine on a case-by-case basis appears to us to provide the most satisfactory means of arriving at detailed constitutional requirements in the area of state legislative apportionment. Cf. Slaughter-House Cases, 16 Wall. 36, 78-79. Thus, we proceed to state here only a few rather general considerations which appear to us to be relevant.
A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. Valid considerations may underlie such aims. Indiscriminate districting, without any regard for political subdivision or *711 natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering. Single-member districts may be the rule in one State, while another State might desire to achieve some flexibility by creating multimember [58] or floterial districts.[59] Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State.
History indicates, however, that many States have deviated, to a greater or lesser degree, from the equal-population principle in the apportionment of seats in at least one house of their legislatures.[60] So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature. But neither history alone,[61] nor economic or other sorts of *712 group interests, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history or economic interests, cast votes. Considerations of area alone provide an insufficient justification for deviations from the equal-population principle. Again, people, not land or trees or pastures, vote. Modern developments and improvements in transportation and communications make rather hollow, in the mid-1960’s, most claims that deviations from population-based representation can validly be based solely on geographical considerations. Arguments for allowing such deviations in order to insure effective representation for sparsely settled areas and to prevent legislative districts from becoming so large that the availability of access of citizens to their representatives is impaired are today, for the most part, unconvincing.
A consideration that appears to be of more substance in justifying some deviations from population-based representation in state legislatures is that of insuring some voice to political subdivisions, as political subdivisions. Several factors make more than insubstantial claims that a State can rationally consider according political subdivisions some independent representation in at least one body of the state legislature, as long as the basic standard of equality of population among districts is maintained. Local governmental entities are frequently charged with various responsibilities incident to the operation of state government. In many States much of the legislature’s activity involves the enactment of so-called local *713 legislation, directed only to the concerns of particular political subdivisions. And a State may legitimately desire to construct districts along political subdivision lines to deter the possibilities of gerrymandering. However, permitting deviations from population-based representation does not mean that each local governmental unit or political subdivision can be given separate representation, regardless of population. Carried too far, a scheme of giving at least one seat in one house to each political subdivision (for example, to each county) could easily result, in many States, in a total subversion of the equal-population principle in that legislative body.[62] This would be especially true in a State where the number of counties is large and many of them are sparsely populated, and the number of seats in the legislative body being apportioned does not significantly exceed the number of counties.[63] Such a result, we conclude, would be constitutionally impermissible. And careful judicial scrutiny must of course be given, in evaluating state apportionment schemes, to the character as well as the degree of deviations from a strict population basis. But if, even as a result of a clearly rational state policy of according some legislative representation to political subdivisions, population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all of the State’s citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired.
*714 VII.
One of the arguments frequently offered as a basis for upholding a State’s legislative apportionment arrangement, despite substantial disparities from a population basis in either or both houses, is grounded on congressional approval, incident to admitting States into the Union, of state apportionment plans containing deviations from the equal-population principle. Proponents of this argument contend that congressional approval of such schemes, despite their disparities from population-based representation, indicates that such arrangements are plainly sufficient as establishing a “republican form of government.” As we stated in Baker v. Carr, some questions raised under the Guaranty Clause are nonjusti-ciable, where “political” in nature and where there is a clear absence of judicially manageable standards.[64] Nevertheless, it is not inconsistent with this view to hold that, despite congressional approval of state legislative apportionment plans at the time of admission into the Union, even though deviating from the equal-population principle here enunciated, the Equal Protection Clause can and does require more. And an apportionment scheme in which both houses are based on population can hardly be considered as failing to satisfy the Guaranty Clause requirement. Congress presumably does not assume, in admitting States into the Union, to pass on all constitutional questions relating to the character of state governmental organization. In any event, congressional approval, however well-considered, could hardly validate an unconstitutional state legislative apportionment. Congress simply lacks the constitutional power to insulate States from attack with respect to alleged deprivations of individual constitutional rights.
*715 VIII.
That the Equal Protection Clause requires, that both houses of a state legislature be apportioned on a population basis does not mean that States cannot adopt some reasonable plan for periodic revision of their apportionment schemes. Decennial reapportionment appears to be a rational approach to readjustment of legislative representation in order to take into account population shifts and growth. Reallocation of legislative seats every 10 years coincides with the prescribed practice in 41 of the States,[65] often honored more in the breach than the observance, however. Illustratively, the Alabama Constitution requires decennial reapportionment, yet the last reapportionment of the Alabama Legislature, when this suit was brought, was in 1901. Limitations on the frequency of reapportionment are justified by the need for stability and continuity in the organization of the legislative system, although undoubtedly reapportioning no more frequently than every 10 years leads to some imbalance in the population of districts toward the end of the decennial period and also to the development of resistance to change on the part of some incumbent legislators. In substance, wé do not regard the Equal Protection Clause as requiring daily, monthly, annual or biennial reapportionment, so long as a State has a reasonably conceived plan for periodic readjustment of legislative representation. While we do not intend to indicate that decennial reapportionment is a constitutional requisite, compliance with such an approach would clearly meet the minimal *716 requirements for maintaining a reasonably current scheme of legislative representation. And we do not mean to intimate that more frequent reapportionment would not be constitutionally permissible or practicably desirable. But if reapportionment were accomplished with less frequency, it would assuredly be constitutionally suspect.
IX.
Although general provisions of the Alabama Constitution provide that the apportionment of seats in both houses of the Alabama Legislature should be on a population basis, other more detailed provisions clearly make compliance with both sets of requirements impossible. With respect to the operation of the Equal Protection Clause, it makes no difference whether a State’s apportionment scheme is embodied in its constitution or in statutory provisions. In those States where the alleged malapportionment has resulted from noncompliance with state constitutional provisions which, if complied with, would result in an apportionment valid under the Equal Protection Clause, the judicial task of providing effective relief would appear to be rather simple. We agree with the view of the District Court that state constitutional provisions should be deemed violative of the Federal Constitution only when validly asserted constitutional rights could not otherwise be protected and effectuated. Clearly, courts should attempt to accommodate the relief ordered to the apportionment provisions of state constitutions insofar as is possible. But it is also quite clear that a state legislative apportionment scheme is no less viola-tive of the Federal Constitution when it is based on state constitutional provisions which have been consistently complied with than when resulting from a noncompliance with state constitutional requirements. When there is an unavoidable conflict between the Federal and a State Constitution, the Supremacy Clause of course controls.
*717 X.
We do not consider here the difficult question of the proper remedial devices which federal courts should utilize in state legislative apportionment cases.[66] Remedial techniques in this new and developing area of the law will probably often differ with the circumstances of the challenged apportionment and a variety of local conditions. It is enough to say now that, once a State’s legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. However, under certain circumstances, such as where an impending election is imminent and a State’s election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court’s decree. As stated by Mr. Justice Douglas, concurring in Baker v. Carr, “any relief accorded can be fashioned in the light of well-known principles of equity.” [67]
*718 We feel that the District Court in this case acted in a most proper and commendable manner. It initially-acted wisely in declining to stay the impending primary election in Alabama, and properly refrained from acting further until the Alabama Legislature had been given an opportunity to remedy the admitted discrepancies in the State’s legislative apportionment scheme, while initially stating some of its views to provide guidelines for legislative action. And it correctly recognized that legislative reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so. Additionally, the court below acted with proper judicial restraint, after the Alabama Legislature had failed to act effectively in remedying the constitutional deficiencies in the State’s legislative apportionment scheme, in ordering its own temporary reapportionment plan into effect, at a time sufficiently early to permit the holding of elections pursuant to that plan without great difficulty, and in prescribing a plan admittedly provisional in purpose so as not to usurp the primary responsibility for reapportionment which rests with the legislature.
We find, therefore, that the action taken by the District Court in this case, in ordering into effect a reapportionment of both houses of the Alabama Legislature for purposes of the 1962 primary and general elections, by using the best parts of the two proposed plans which it had found, as a whole, to be invalid,[68] was an appropriate and *719 well-considered exercise of judicial power. Admittedly, the lower court’s ordered plan was intended only as a temporary and provisional measure and the District Court correctly indicated that the plan was invalid as a permanent apportionment. In retaining jurisdiction while deferring a hearing on the issuance of a final injunction in order to give the provisionally reapportioned legislature an opportunity to act effectively, the court below proceeded in a proper fashion. Since the District Court evinced its realization that its ordered reapportionment could not be sustained as the basis for conducting the 1966 election of Alabama legislators, and avowedly intends to take some further action should the reapportioned Alabama Legislature fail to enact a constitutionally valid, permanent apportionment scheme in the interim, we affirm the judgment below and remand the cases for further proceedings consistent with the views stated in this opinion.

It is so ordered.

Sims v. Frink, 208 F. Supp. 431 (D. C. M. D. Ala. 1962). All decisions of the District Court in this litigation are reported sub nom. Sims v. Frink.

 Included among the defendants were the Secretary of State and the Attorney General of Alabama, the Chairmen and Secretaries of the Alabama State Democratic Executive Committee and the State Republican Executive Committee, and three Judges of Probate of three counties, as representatives of all the probate judges of Alabama.

 Provisions virtually identical to those contained in Art. IX, §§ 202 and 203, were enacted into the Alabama Codes of 1907 and 1923, and were most recently reenacted as statutory provisions in §§ 1 and 2 of Tit. 32 of the 1940 Alabama Code (as recompiled in 1958).

 See Opinion of the Justices, 263 Ala. 158, 164, 81 So. 2d 881, 887 (1955), and Opinion of the Justices, 254 Ala. 185, 187, 47 So. 2d 714, 717 (1950), referred to by the District Court in its preliminary opinion. 205 F. Supp. 245, 247.

 See Ex parte Rice, 273 Ala. 712, 143 So. 2d 848 (1962), where the Alabama Supreme Court, on May 9, 1962, subsequent to the District Court’s preliminary order in the instant litigation as well as our decision in Baker v. Carr, 369 U. S. 186, refused to review a denial of injunctive relief sought against the conducting of the 1962 primary election until after reapportionment of the Alabama Legislature, stating that “this matter is a legislative function, and . . . the Court has no jurisdiction. . . And in Waid v. Pool, 255 Ala. 441, 51 So. 2d 869 (1951), the Alabama Supreme Court, in a similar suit, had stated that the lower court had properly refused to grant injunc-tive relief because “appellants ... are seeking interference by the judicial department of the state in respect to matters committed by the constitution to the legislative department.” 255 Ala., at 442, 51 So. 2d, at 870.

 Under 28 U. S. C. §§ 2281 and 2284.

 During the over 60 years since the last substantial reapportionment in Alabama, the State’s population increased from 1,828,697 to *675 3,244,286. Virtually all of the population gain occurred in urban counties, and many of the rural counties incurred sizable losses in population.

See 369 U. S., at 260 (Clark, J., concurring).

 Proposed Constitutional Amendment No. 1 of 1962, Alabama Senate Bill No. 29, Act No. 93, Acts of Alabama, Special Session, 1962, p. 124. The text of the proposed amendment is set out as Appendix B to the lower court’s opinion. 208 F. Supp., at 443-444.

 For a discussion of this method of apportionment, used in distributing seats in the Federal House of Representatives among the States, and other commonly used apportionment methods, see Schmeekebier, The Method of Equal Proportions, 17 Law & Contemp. Prob. 302 (1952).

 Alabama Reapportionment Act of 1962, Alabama House Bill No. 59, Act No. 91, Acts of Alabama, Special Session, 1962, p. 121. The text of the act is reproduced as Appendix C to the lower court's opinion. 208 F. Supp.,.at 445-446.

 A comprehensive chart showing the representation by counties in the Alabama House of Representatives under the existing apportionment provisions is set out as Appendix- D to the lower court’s opinion. 208 F. Supp., at 447-449. This chart includes the number of House seats given to each county, and the populations of the 67 Alabama counties under the 1900, 1950, and 1960 censuses.

 Although cross-appellants in No. 27 assert that the Alabama Constitution forbids the division of a county, in forming senatorial districts, only when one or both pieces will be joined with another county to form a multicounty district, this view appears to be contrary to the language of Art. IX, § 200, of the Alabama Constitution and the practice under it. Cross-appellants contend that counties entitled by population to two or more senators can be split'into the appropriate number of districts, and argue that prior to the adoption of the 1901 provisions the Alabama Constitution so provided and there is no reason to believe that the language of the present provision was intended to effect any change. However, the only appor-tionments under the 1901 Alabama Constitution- — -the 1901 provisions and the Crawford-Webb Act — gave no more than one seat to a county even though by population several counties would have been entitled to additional senatorial representation.

 A chart showing the composition, by counties, of the 35 senatorial districts provided for under the existing apportionment, and the population of each according to the 1900, 1950, and 1960 censuses, is reproduced as Appendix E to the lower court’s opinion. 208 F. Supp., at 450.

 208 F. Supp., at 437.

 Id., at 438.

 According to the District Court, in the interval between its preliminary order and its decision on the merits, the Alabama Legislature, despite adopting this constitutional amendment proposal, “refused to inquire of the Supreme Court of the State of Alabama whether this provision in the Constitution of the State of Alabama could be changed by constitutional amendment as the '67-Senator Amendment’ proposes.” 208 F. Supp., at 437.

 At least this is the reading of the District Court of two somewhat conflicting decisions by the Alabama Supreme Court, resulting in a “manifest uncertainty of the legality of the proposed constitutional amendment, as measured by State standards 208 F. Supp., at 438. Compare Opinion of the Justices, 254 Ala. 183, 184, 47 So. 2d 713, 714 (1950), with Opinion of the Justices, 263 Ala. 158, 164, 81 So. 2d 881, 887 (1955).

 See the later discussion, infra, at 568-569, and note 68, infra, where we reject the lower court’s apparent conclusion that the apportionment of the Alabama House, under the 67-Senator Amendment, comported with the requirements of the Equal Protection Clause.

 While no formula for the statute’s apportionment of representatives is expressly stated, one can be extrapolated. Counties with less than 45,000 people are given one seat; those with 45,000 to 90,000 *682 receive two seats; counties with 90,000 to 150,000, three seats; those with 150,000 to 300,000, four seats; counties with 300,000 to 600,000, six seats; and counties with over 600,000 are given 12 seats.

 Appendix F to the lower court’s opinion sets out a chart showing the populations of the 35 senatorial districts provided for under the Crawford-Webb Act and the composition, by counties, of the various districts. 208 F. Supp., at 451.

 Cross-appellants in No. 27 assert that the Crawford-Webb Act was a "minimum-change measure” which merely redrew new senatorial district lines around the nominees of the May 1962 Democratic primary so as to retain the seats of 34 of the 35 nominees, and resulted, in practical effect, in the shift of only one Senate seat from an overrepresented district to another underpopulated, newly created district.

 208 F. Supp., at 439.

 Possibly this resulted from an understandable desire on the part of the Alabama Legislature to await a final determination by this Court in the instant litigation before proceeding to enact a permanent apportionment plan.

 However, a proposed constitutional amendment, which would have made the Alabama House of Representatives somewhat more representative of population but the Senate substantially less so, was rejected by the people in a 1956 referendum, with the more populous counties accounting for the defeat.
See the discussion in Lucas v. Forty-Fourth General Assembly of Colorado, post, pp. 736-737, decided also this date, with respect to the lack of federal constitutional significance of the presence or absence of an available political remedy.

 Ala. Const., Art. XVIII, § 284.

 Ala. Const., Art. XVIII, § 286.

 The Fifteenth, Seventeenth, Nineteenth, Twenty-third and Twenty-fourth Amendments to the Federal Constitution all involve expansions of the right of suffrage. Also relevant, in this regard, is the civil rights legislation enacted by Congress in 1957 and 1960.

 As stated by MR. Justice Douglas, dissenting, in South v. Peters, 339 U. S. 276, 279:
“There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. The right to vote includes the right to have the ballot counted. ... It also includes the right to have the vote counted at full value without dilution or discount. . . . That federally protected right suffers substantial dilution . . . [where a] favored group *688 has full voting strength . . . [and] [t]he groups not in favor have their votes discounted.”

 Litigation challenging the constitutionality of state legislative apportionment schemes had been instituted in at least 34 States prior to the end of 1962 — within nine months of our decision in Baker v. Carr. See McKay, Political Thickets and Crazy Quilts: Reapportionment and Equal Protection, 61 Mich. L. Rev. 645, 706-710 (1963), which contains an appendix summarizing reapportionment litigation through the end of 1962. See also David and Eisenberg, Devaluation of the Urban and Suburban Vote (1961); Goldberg, The Statistics of Mal-apportionment, 72 Yale L. J. 90 (1962).

 369 U. S„ at 198.

 Id., at 226.

Scholle v. Hare, 369 U. S. 429 (Michigan); WMCA, Inc., v. Simon, 370 U. S. 190 (New York).

 372 U. S., at 379-380.

 Id., at 381.

 Id., at 376. Later in the opinion we again stated:
“Nor does the question here have anything to do with the composition of the state or federal legislature. And we intimate no opinion on the constitutional phases of that problem beyond what we said in Baker v. Carr ....’’ Id., at 378.

 376 U. S., at 14.

 Id., at 17-18.

 As stated by Mr. Justice Douglas, the rights sought to be vindicated in a suit challenging an apportionment scheme are “personal and individual,” South v. Peters, 339 U. S., at 280, and are “important political rights of the people,” MacDougall v. Green, 335 U. S. 281, 288. (Douglas, J., dissenting.)

 As stated by MR. Justice Black, dissenting, in Colegrove v. Green, 328 U. S. 549, 569-571:
“No one would deny that the equal protection clause would . . . prohibit a law that would expressly give certain citizens a half-vote and others a full vote. . . . [T]he constitutionally guaranteed right to vote and the right to have one’s vote counted clearly imply the policy that state election systems, no matter what their form, should be designed to give approximately equal weight to each vote cast. . . . [A] state legislature cannot deny eligible voters the right to vote for Congressmen and the right to have their vote counted. It can no more destroy the effectiveness of their vote in part and no more accomplish this in the name of ‘apportionment’ than under any other name.”

 376 U. S., at 8. See also id,., at 17, quoting from James Wilson, a delegate to the Constitutional Convention and later an Associate Justice of this Court, who stated:
“[A] 11 elections ought to be equal. Elections are equal, when a given number of citizens, in one part of the state, choose as many representatives, as are chosen by the same number of citizens, in any other part of the state. In this manner, the proportion of the representatives and of the constituents will remain invariably the same.” 2 The Works of James Wilson (Andrews ed. 1896) 15.
And, as stated by Mr. Justice Douglas, dissenting, in MacDougall v. Green, 335 U. S., at 288, 290:
“[A] regulation . . . [which] discriminates against the residents of the populous counties of the state in favor of rural sections . . . lacks the equality to which the exercise of political rights is entitled under the Fourteenth Amendment.
“Free and honest elections are the very foundation of our republican form of government. . . . Discrimination against any group or class of citizens in the exercise of these constitutionally protected rights of citizenship deprives the electoral process of integrity. . . .
“None would deny that a state law giving some citizens twice the vote of other citizens in either the primary or general election would lack that equality which the Fourteenth Amendment guarantees. . . . The theme of the Constitution is equality among citizens in the exercise of their political rights. The notion that one group can be granted greater voting strength than another is hostile to our standards for popular representative government.”

 364 U. S., at 347.

 Although legislative apportionment controversies are generally-viewed as involving urban-rural conflicts, much evidence indicates that presently it is the fast-growing suburban areas which are probably the most seriously underrepresented in many of our state legislatures. And, while currently the thrust of state legislative mal-apportionment results, in most States, in underrepresentation of urban and suburban areas, in earlier times cities were in fact overrepresented in a number of States. In the early 19th century, certain of the seaboard cities in some of the Eastern and Southern States possessed and struggled to retain legislative representation disproportionate to population, and bitterly opposed according additional representation to the growing inland areas. Conceivably, in some future time, urban areas might again be in a situation of attempting to acquire or retain legislative representation in excess of that to which, on a population basis, they are entitled. Malapportionment can, and has historically, run in various directions. However and whenever it does, it is constitutionally impermissible under the Equal Protection Clause.

 The British experience in eradicating “rotten boroughs” is interesting and enlightening. Parliamentary representation is now based on districts of substantially equal population, and periodic reapportionment is accomplished through independent Boundary Commissions. For a discussion of the experience and difficulties in Great Britain in achieving fair legislative representation, see Edwards, Theoretical and Comparative Aspects of Reapportionment and Re *700 districting: With Reference to Baker v. Carr, 15 Vand. L. Rev. 1265, 1275 (1962). See also the discussion in Baker v. Carr, 369 U. S., at 302-307. (Frankfurter, J., dissenting.)

 Under the existing scheme, Marshall County, with a 1960 population of 48,018, Baldwin County, with 49,088, and Houston County, with 50,718, are each given only one seat in the Alabama House, while Bullock County, with only 13,462, Henry County, with 15,286, and *701 Lowndes County, with 15,417, are allotted two representatives each. And in the Alabama Senate, under the existing apportionment, a district comprising Lauderdale and Limestone Counties had a 1960 population of 98,135, and another composed of Lee and Russell Counties had 96,105. Conversely, Lowndes County, with only 15,417, and Wilcox County, with 18,739, are nevertheless single-county senatorial districts given one Senate seat each.

 An interesting pre-Baker discussion of the problem of legislative malapportionment in Alabama is provided in Comment, Alabama’s Unrepresentative Legislature, 14 Ala. L. Rev. 403 (1962).

 See the eases cited and discussed in notes 4-5, supra, where the Alabama Supreme Court refused even to consider the granting of relief in suits challenging the validity of the apportionment of seats in the Alabama Legislature, although it stated that the legislature had failed to comply with the requirements of the State Constitution with respect to legislative reapportionment.

 However, since the District Court found the proposed constitutional amendment prospectively invalid, it was never in fact voted upon by the State’s electorate.

 Resemblances between the system of representation in the Federal Congress and the apportionment scheme embodied in the 67-Senator Amendment appear to be more superficial than actual. Representation in the Federal House of Representatives is apportioned by the Constitution among the States in conformity with population. While each State is guaranteed at least one seat in the House, as a *704 feature of our unique federal system, only four States have less than 1/435 of the country’s total population, under the 1960 census. Thus, only four seats in the Federal House are distributed on a basis other than strict population. In Alabama, on the other hand, 40 of the 67 counties have less than 1/106 of the State’s total population. Thus, under the proposed amendment, over % of the total number of seats in the Alabama House would be distributed on a basis other than strict population. States with almost 50% of the Nation’s total population are required in order to elect a majority of the members of the Federal House, though unfair districting within some of the States presently reduces to about 42% the percentage of the country’s population which reside in districts electing individuals comprising a majority in the Federal House. Cf. Wesberry v. Sanders, supra, holding such congressional districting unconstitutional. Only about 43% of the population of Alabama would live in districts which could elect a majority in the Alabama House, under the proposed constitutional amendment. Thus, it could hardly be argued that the proposed apportionment of the Alabama House was based on population in a way comparable to the apportionment of seats in the Federal House among the States.

 For a thorough statement of the arguments against holding the so-called federal analogy applicable to state legislative apportionment matters, see, e.g., McKay, Reapportionment and the Federal Analogy (National Municipal League pamphlet 1962); McKay, The Federal Analogy and State Apportionment Standards, 38 Notre Dame Law. 487 (1963). See also Merrill, Blazes for a Trail Through the Thicket of Reapportionment, 16 Okla. L. Rev. 59, 67-70 (1963).

 208 F. Supp., at 438. See the discussion of the District Court’s holding as to the applicability of the federal analogy earlier in this opinion, supra, at 547-548.

 Report of Advisory Commission on Intergovernmental Relations, Apportionment of State Legislatures 10-11, 35, 69 (1962).

 Thomas Jefferson repeatedly denounced the inequality of representation provided for under the 1776 Virginia Constitution and frequently proposed changing the State Constitution to provide that both houses be apportioned on the basis of population. In 1816 he wrote that “a government is republican in proportion as every member composing it has his equal voice in the direction of its concerns ... by representatives chosen by himself . . . .” Letter to Samuel Kercheval, 10 Writings of Thomas Jefferson (Ford ed. 1899) 38. And a few years later, in 1819, he stated: “Equal representation is so fundamental a principle in a true republic that no prejudice can justify its violation because the prejudices themselves cannot be justified.” Letter to William King, Jefferson Papers, Library of Congress, Vol. 216, p. 38616.

 Article II, § 14, of the Northwest Ordinance of 1787 stated quite specifically: “The inhabitants of the said territory shall always be entitled to the benefits ... of a proportionate representation of the people in the Legislature.”

 See the discussion in Wesberry v. Sanders, 376 U. S., at 9-14.

 372 U. S., at 378.

 As stated by the Court in Bain Peanut Co. v. Pinson, 282 U. S. 499, 501, “We must remember that the machinery of government would not work if it were not allowed a little play in its joints.”

 But cf. the discussion of some of the practical problems inherent in the use of multimember districts in Lucas v. Forty-Fourth General Assembly of Colorado, post, pp. 731-732, decided also this date.

 See the discussion of the concept of floterial districts in Davis v. Mann, post, pp. 686-687, n. 2, decided also this date.

 For a discussion of the formal apportionment formulae prescribed for the allocation of seats in state legislatures, see Dixon, Apportionment Standards and Judicial Power, 38 Notre Dame Law. 367, 398-400 (1963). See also The Book of the States 1962-1963, 58-62.

 In rejecting a suggestion that the representation of the newer Western States in Congress should be limited so that it would never exceed that of the original States, the Constitutional Convention plainly indicated its view that history alone provided an unsatisfactory basis for differentiations relating to legislative representation. See Wesberry v. Sanders, 376 U. S., at 14. Instead, the Northwest *712 Ordinance of 1787, in explicitly providing for population-based representation of those living in the Northwest Territory in their territorial legislatures, clearly implied that, as early as the year of the birth of our federal system, the proper basis of legislative representation was regarded as being population.

 See McKay, Political Thickets and Crazy Quilts: Reapportionment and Equal Protection, 61 Mich. L. Rev. 645, 698-699 (1963).

 Determining the size of its legislative bodies is of course a matter within the discretion of each individual State. Nothing in this opinion should be read as indicating that there are any federal constitutional máximums or mínimums on the size of state legislative bodies.

 See 369 U. S., at 217-232, discussing the non justiciability of malapportionment claims asserted under the Guaranty Clause.

 Report of Advisory Commission on Intergovernmental Relations, Apportionment of State Legislatures 56 (1962). Additionally, the constitutions of seven other States either require or permit reapportionment of legislative representation more frequently than every 10 years. See also The Book of the States 1962-1963, 58-62.

 Cf. Baker v. Carr, 369 U. S. 186, 198. See also 369 U. S., at 250-251 (Douglas, J., concurring), and passages from Baker quoted in this opinion, supra, at 556, 557, and infra.

 369 U. S., at 250.

 Although the District Court indicated that the apportionment of the Alabama House under the 67-Senator Amendment was valid and acceptable, we of course reject that determination, which we regard as merely precatory and advisory since the court below found the *719 overall plan, under the proposed constitutional amendment, to be unconstitutional. See 208 F. Supp., at 440-441. See the discussion earlier in this opinion, supra, at 568-569.