Louis WOLFSON II et al., Plaintiffs,

v.

Harry M. NEARING, Supervisor of Elections for Duval County, Florida, and Richard A. Stone, Secretary of State of Florida, Defendants.

George W. FEE, individually, and as Mayor of the City of Temple Terrace, Florida, et al., Petitioners,

v.

James A. SEBESTA, as Supervisor of Elections for Hillsborough County, Florida, and Richard Stone, Secretary of the State of Florida, Respondents.

E. J. JOHNSTON and John Reed, Jr., as a representative of a class, Plaintiffs,

v.

BOARD OF COUNTY COMMISSIONERS OF ESCAMBIA COUNTY, Florida, et al., Defendants.

Kathleen WRIGHT, Harry Glover, and all others similarly situated, Plaintiffs,

v.

Jane CARROLL, Supervisor of Elections for Broward County, Florida, and Richard Stone, Secretary of State of Florida, Defendants.

Nos. 72–425–Civ.–J–M, 72–486–Civ.–J–M, 72–523–Civ.–J–M, and 72–524–Civ.–J–M.

United States District Court,
M. D. Florida,
Jacksonville Division.

July 31, 1972.

McCrary, Ferguson & Lee (Jesse J. McCrary, Jr.), Miami, Fla., Joseph C. Jacobs, Tallahassee, Fla., for Louis Wolfson, II, and others.

Robert L. Shevin, Atty. Gen., Jerry E. Oxner, Asst. Atty. Gen., Tallahassee, Fla., John E. Mathews, Jr., Sp. Asst. Atty. Gen., Charles P. Pillans, III, Asst. Counsel, City of Jacksonville, Jacksonville, Fla., for Harry M. Nearing, Supervisor of Elections, etc., and others.

Gibbons, Tucker, McEwen, Smith, Cofer & Taub (James M. McEwen), Tampa, Fla., for George W. Fee, and others.

Robert L. Shevin, Atty. Gen., Jerry E. Oxner, Asst. Atty. Gen., Tallahassee, Fla., John E. Mathews, Jr., Sp. Asst. Atty. Gen., Jacksonville, Fla., and David Thorpe, Asst. County Atty., Tampa, Fla., for James A. Sebesta, as Supervisor of Elections, etc., and others.

Fitzgerald & Johnston (James A. Johnston), Milton, Fla., E. J. Johnston and John Reed, Jr., as a representative of a class.

Robert L. Shevin, Atty. Gen., Jerry E. Oxner, Asst. Atty. Gen., John E. Mathews, Jr., Sp. Asst. Atty. Gen., for Board of County Comm'rs of Escambia, Santa Rosa, Okaloosa and Walton Counties, and Jane Carroll, Supervisor of Elections, etc., and others.

Zebedee W. Wright, Ft. Lauderdale, Fla., for Kathleen Wright, Harry Glover, and all others similarly situated.

## OPINION

Before SIMPSON, Circuit Judge, and McRAE and TJOFLAT, District Judges.

PER CURIAM:

Plaintiffs in these consolidated cases invoke the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1343, 2201, alleging a denial to them as electors of the equal protection of the laws, for which they seek relief under the provisions of 42 U.S.C. § 1983.

By order of court entered July 14, 1972, these consolidated cases were each dismissed with prejudice and the parties in one of them, who had made to the Florida Supreme Court the same unsuccessful arguments made in the present case, were for that reason dismissed from this law suit without prejudice to their seeking review of the judgment of the Florida Supreme Court in the Supreme Court of the United States.

Plaintiffs challenge the constitutionality of the Florida legislative reapportionment plan enunciated in Senate Joint Resolution 1305, adopted by the Florida legislature in this year's regular session to govern elections beginning this fall. The challenge is both to the plan on its face and to various alleged effects of the plan plaintiffs say may now reasonably be anticipated from its operation.

After adoption of the plan by the legislature, the Florida Supreme Court reviewed Senate Joint Resolution 1305, as required by the Florida Constitution, Art. III § 16(c), F.S.A. That Court gave thorough consideration to the questions of compliance by the plan with the requirements of the Florida and United States Constitutions. With the Court's resolution of these questions in favor of the facial constitutional validity of the plan, the plan assumed the force of a state law of state-wide application. In Re: Apportionment Law Appearing As Senate Joint Resolution Number 1305, 1972 Regular Session; Constitutionality Vel Non of, No. 42,253 (Fla. May 12, 1972), as clarified No. 42,253 (Fla. May 25, 1972). Accordingly, a three-judge District Court was convened pursuant to 28 U.S.C. §§ 2281, 2284 to hear the present cases. Cf. Sincock v. Duffy, 215 F.Supp. 169 (D.Del.1963), aff'd sub nom. Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964).

█ Plaintiffs Louis Wolfson, II, Essie Woodberry and Quillian S. Yancy participated in the proceedings before the Florida Supreme Court. When they did not prevail there, they came here instead of appealing the decision of the Florida Supreme Court to the United State Supreme Court or seeking certiorari, pursuant to 28 U.S.C. § 1257, although application for review in the United States Supreme Court would still be timely. Because of this circumstance, these plaintiffs may not maintain the present suit. Brown v. Chastain, 416 F.2d 1012 (5th Cir. 1969); see cases collected at 1014. In Brown v. Chastain, it was held that the district court had erred in reaching the merits of a federal claim already presented to state courts, even though the time for applying to the Supreme Court of the United States for review of the state court resolution of the federal constitutional question had already expired. With respect to these plaintiffs, there is even less justification for this Court to hear what is essentially an appeal from a decision of the Florida Supreme Court.

█ The remaining plaintiffs are properly before the court. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The first claim they advance is that this reapportionment plan is constitutionally invalid on its face. We agree with the Florida Supreme Court that the cases lend no support to such a claim. The evidence clearly demonstrates, and plaintiffs do not suggest otherwise, that there has been full compliance with the "one man, one vote" rule announced in Gray v. Sanders, 372 U.S. 367, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) (primary elections) and Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (general elections). The one hundred twenty legislative and forty senatorial districts have been drawn so that the population of the State is allocated among them with near mathematical precision. Such

miniscule variations as there are [1] present no constitutional problem. Cf. Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967). "[M]athematical nicety is not a constitutional requisite." Reynolds v. Sims, supra, at 569, 84 S.Ct. at 1385.

The decision in Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1970), which controls in other aspects of this case, as well, is dispositive of the challenge to the plan on its face. *Whitcomb* stands, at least, for the proposition that a reapportionment plan conforming to the requirements of Gray v. Sanders, *supra* and Reynolds v. Sims, *supra, as refined,* Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964); Swann v. Adams, *supra;* Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969); Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969) ("variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown" at 531, 89 S.Ct. at 1229), is not constitutionally defective on its face.

■ There are nevertheless two avenues of constitutional attack, outside the plan itself, when there is compliance with "one man, one vote." The more direct avenue is proof of intentional discrimination by those drawing the apportionment plan. Sims v. Baggett, 247 F. Supp. 96 (M.D.Ala.1965); Smith v. Paris, 257 F.Supp. 901 (M.D.1966), aff'd 386 F.2d 979 (5th Cir. 1967). In the present case, there has been neither allegation nor proof of such intentional discrimination.

The other and more tortuous avenue, is proof of discriminatory effect on and actual prejudice [2] to an identifiable racial or political segment of electors.

Whitcomb v. Chavis, *supra.* It is down this avenue that plaintiffs set out to travel. On account of the impending deadline for the qualification of candidates, proceedings in the present case were expedited. All parties were given an opportunity to present evidence, however, and extensive evidence was introduced. Although explicitly given opportunity to do so, no party made objection at the final hearing to the prompt disposition of the present controversy and no party requested an opportunity to present further evidence.

In the case of Fee et al. v. Sebesta et al. the evidence established that the small suburban community of Temple Terrace was unwittingly cut in half by the reapportionment computer team with the result that a moiety of its citizenry must vote in the same five-member house district with greater Tampa. This was represented as being anathema to the citizens of Temple Terrace because the population of Tampa and the population of Temple Terrace have for years been at loggerheads on the issue of annexation by Tampa of Temple Terrace, and anxiety was expressed that the interests of Temple Terrace in this matter will not be represented by the Tampa delegation.

In the case of Johnston et al. v. Board of County Commissioners et al. the parties stipulated that the population of the three-member house district wholly contained within Escambia County (House District 1–3) includes 35,451 black citizens and 132,392 caucasian citizens; that the population of Escambia County lying in the three-member house district embracing north Escambia County and all or part of Okaloosa, Santa Rosa, and Walton counties (House District 4–6) includes 4,925 black citizens and 30,563

---

1. The population of no legislative nor any senatorial district exceeds or falls short by as much as one percent of the ideal, obtained by dividing the population of the State by the number of legislative or senatorial districts, respectively.

2. If line drawing operates to *disenfranchise* black citizens, a fifteenth amendment claim exists, even absent demonstrable injury. Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). In such a situation, of course, there is necessarily noncompliance with "one man, one vote."

caucasian citizens. In the whole of House District 4–6, there are 14,480 black citizens.

In the cases of Wolfson et al. v. Nearing et al. and Wright et al. v. Carroll et al. issue was joined and evidence adduced with regard to the anticipated operation of the apportionment plan in five different localities: Gadsden, Broward, Dade, Duval and Polk counties.

Gadsden. Gadsden County is unique in Florida in having more black residents than white residents. Of a total population of 39,184 persons, there are 23,228 black persons. Under the house plan, the county is split so that the western portion of the county in which 4,003 black citizens reside forms a part of House District 9 and the eastern portion in which 19,225 black citizens reside forms a part of House District 10. In House District 10 as a whole, 26,499 persons, or 46.8 percent are black. In House District 9 as a whole, 8,735 persons, or 15.4 percent are black. Under the Senate plan, Gadsden County is grouped with other counties to form a two member district.

Broward and Dade. These two densely populated Gold Coast counties have Ft. Lauderdale and Miami, respectively, as their county seats. The largest multi-member districts provided for under both the Senate (three-member) and the house (six-member) plans are located in this part of the state. There are a number of readily identifiable black ghetto areas.

Duval. Most of the Jacksonville area is within a three-member senatorial district. Single member Senate District 11, however, includes part of the beaches and meanders downstate as far as Lake and Sumter Counties. Jacksonville and environs are divided into two multi-member house districts. There are readily identifiable black ghetto areas.

Polk. The Lakeland area with its citrus, cattle, and phosphate mines is criss-crossed by district lines. Senator Dempsey Barron explained that in the central areas of the state the legislative objective of preserving county lines had to give way altogether to the "one man, one vote" requirement, because districting started at the ends of Florida's peninsula and Panhandle, and Florida's geography is such as to make this problem unavoidable at one point or another.

Senator Barron, Representative George Firestone and Mr. Alexander, a computer expert, testified to the manner in which district lines were drawn. The census data with which the computer team worked did not reflect the racial composition of the various census tracts. Dr. Manning J. Dauer, for many years a close student of legislative apportionment, and a recognized expert in this field, testified that the districts were drawn equitably and that instances where local governmental boundaries were ignored, as in Temple Terrace and Duval County, were of no great moment because, under the basic philosophy of the Florida Constitution of 1968, the legislature's province is the resolution of state-wide problems, while local matters can be adequately dealt with by local governments. See Florida Constitution, Art. VIII.

Plaintiffs argue unconvincingly that the evidence before the court would support findings that the plan is unconstitutional because gerrymandering and multi-member districts are used with discriminatory effect so as to cancel out or minimize the votes of racial and political elements of the constituency.

■ As to political gerrymandering, the facts in the *Fee* case entitle the plaintiffs to no relief. The right to vote is a personal right. Reynolds v. Sims, 377 U.S. at 561, 84 S.Ct. 1362, 12 L.Ed. 2d 506; Sims v. Baggett, 247 F.Supp. 96 (M.D.Ala.1965). The town of Temple Terrace has no right to vote. The group of Floridians opposed to Temple Terrace's annexation by Tampa has no right to vote, as a bloc. It is only individuals, as individuals, who have a right to vote and these rights have not been abridged. Kilgarlin v. Martin, 252 F.Supp. 404, 432, 434 (S.D.Tex.1966), aff'd sub nom. Kilgarlin v. Hill, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771, reh. den'd 386 U.S.

999, 87 S.Ct. 1300, 18 L.Ed.2d 352 (1967). In fact, the residents of Temple Terrace may be said to have greater representation under the plan than they would if they were all in one district since, conceivably, as a group they could cast determinative votes in nine house seat elections, rather than in four or five.

Additionally, in the case of Wright et al. v. Jane Carroll et al., it was stipulated that "there are more voters registered as Republicans than Democrats in new House Legislative Districts 84–88, and that there are more voters registered as Democrats than Republicans in new House Legislative Districts 92–97." This circumstance, without more, fails to support any claim on which relief might be granted. In Whitcomb v. Chavis, Mr. Justice White, writing for the Court, speaks to this point in saying, "[W]e have not yet deemed it a denial of equal protection to deny legislative seats to losing candidates, even in those so-called "safe" districts where the same party wins year after year."

■ The evidence likewise fails to support the allegations of racial gerrymandering as to house districts in Escambia and Gadsden Counties. The two house districts embracing parts of Escambia County have 35,451 and 14,480 black residents, respectively. The two house districts embracing parts of Gadsden County have 26,499 and 8,735 black residents, respectively. If the right protected by Reynolds v. Sims is the right to equality of representation, these figures are irrelevant because each citizen's representative speaks and votes in the legislature on behalf of the same number of citizens as does every other representative in the house. Black citizen and white citizen alike have roughly ⅙₆,₀₀₀th of a vote apiece in the house of representatives. If, however, the right protected by Reynolds v. Sims is the

right to an equal chance to cast a determinative vote in a legislative election, these figures demonstrate that the power of black voters in this regard has not been minimized even on the unproven assumption that black electors vote as a bloc while other electors do not[3]. In House District 10, in which better than three of every four Gadsden County blacks are to vote, more than 46 percent of the voters are black, while in House District 9 in which less than one of four Gadsden County blacks is to vote, only 15 percent of the voters are black. A plan might have been devised with a view toward minimization of the election-determining power of black voters by drawing the line through Gadsden County so as to put the larger number of Gadsden County black voters in District 9 where there are fewer blacks outside Gadsden County. The present plan does not approach a minimization of the election-determining power of black electors.

■ Whitcomb v. Chavis places on plaintiffs the heavy burden to prove that the use of multi-member districts is invidiously discriminatory. Under the Senate plan, the largest multi-member district contains 7.5 percent of the State population and sends three senators to Tallahassee. Under the house plan, the largest multi-member district contains five percent of Florida's population and is represented by a six-member delegation. Under both plans representatives are chosen at large within the district.

Plaintiffs have failed to show the actual or probable influence of any multi-member delegation in the legislature. They have failed to establish recurring poor performance or the likelihood thereof in representing the interests of any black element of the constituency of any district. They have failed to demonstrate what these interests are in a specific legislative context or that there is likelihood that the failure of any spe-

---

3. Mr. Justice Harlan points out the ambiguity in the Reynolds case in his separate opinion in Whitcomb v. Chavis, 403 U.S. at 167–170, 91 S.Ct. 1858, 29 L.Ed.

2d 363 (1970). See Note, Equal Representation and the Weighted Voting Alternative, 79 Yale L.J. 311, 312 (1969).

cific delegation to work in furtherance of any such interests will determine the fate of any piece of legislation. In all these respects, the proof is deficient under Whitcomb v. Chavis.

Plaintiffs are entitled to no relief.