639 A.2d 157

**Brenda AJAMIAN, et al.**

v.

**MONTGOMERY COUNTY, Maryland, et al.**

**No. 88, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

April 4, 1994.

666

Charles Michael Tobin (Stefanie L. Schwartz and Ober, Kaler, Grimes & Griver, on the brief) Washington, DC, for appellants.

Linda B. Thall, Rockville (Joyce R. Stern, Rockville, and John P. Diuguid, Washington, DC, on the brief), for appellees.

Argued before WILNER, C.J., and BISHOP and MOTZ, JJ.

MOTZ, Judge.

This case involves challenges by certain Montgomery County voters to the councilmanic redistricting plan that was enacted by the Montgomery County Council following the 1990 census and to the process and procedures employed in enacting this plan. After a bench trial, the Circuit Court for Montgomery County (Ferretti, J.) rejected all of these challenges. The voters appealed and, upon the parties' joint motion, we agreed to expedite consideration of the appeal.

(i)

The Montgomery County Council is composed of nine members, five of whom are elected from councilmanic districts and four from the County at large. The County Charter requires that the councilmanic districts be "reestablished" every ten years. Montgomery County Charter art. 1, § 104. The Charter further provides that the "County shall be divided into five Councilmanic districts for the purpose of nominating and electing five members of the Council. Each district shall be compact in form and be composed of adjoining territory. Populations of the Councilmanic districts shall be substantially equal." *Id.* art. 1, § 103. The following procedure is to be followed in formulating a new redistricting plan:

Whenever district boundaries are to be reestablished the Council shall appoint, not later than February 1 of the year prior to the year in which redistricting is to be effective, a commission on redistricting, composed of three members from each political party chosen from a list of five names

submitted by the central committee of each political party which polled at least fifteen percent of the total vote cast for all candidates for the Council in the last preceding regular election. The Council shall appoint one additional member of the Commission. The Commission shall, at its first meeting, select one of its members to serve as chairman. No person who holds any elected office shall be eligible for appointment to the Commission.

By November 15 of the year prior to the year in which redistricting is to be effective, the Commission shall prepare a plan of Councilmanic districts and shall present that plan, together with a report explaining it, to the Council. Within thirty days after receiving the plan of the Commission, the Council shall hold a public hearing on the plan. If within ninety days following presentation of the Commission's plan no other law reestablishing the boundaries of the Councilmanic districts has been enacted, then the plan, as submitted, shall become law.

*Id.* art. 1, § 104.

In 1991, only the Democratic and Republican parties "polled at least fifteen percent of the total vote cast for all [Council] candidates" and so each of their central committees nominated five persons to serve on the Redistricting Commission; from these nominees, six persons were appointed to the Commission. The Council appointed Marie Garber, the former State Administrator of Elections, as the Commission's seventh member. Ms. Garber was selected to serve as Chair of the Commission. On November 1, 1991, after holding numerous public meetings throughout the County, the Commission submitted to the County Council a redistricting plan and explanatory report, which had been approved by a majority of the Commission's members. Two other plans, which had been prepared by the minority (Republican) members of the Commission, accompanied the majority-approved plan and report submitted to the Council.

On November 5, 1991, at a non-legislative Council meeting, Councilmember Isiah Leggett (then the President of the

County Council) announced his intention to propose an amendment to the Commission's plan involving the County's Darnestown precincts, *i.e.*, precincts 6–1 and 6–5. At a special legislative session of the Council held two days later (on November 7, 1991), the Council's two Republican members (Councilmembers Nancy Dacek and Betty Ann Krahnke, each of whom represents a particular pre-existing councilmanic district) introduced two bills, Nos. 56–91 and 57–91, embodying the plans favored by the minority members of the Redistricting Commission. On that same day, Councilmember William Hanna requested in a memorandum to a council attorney that Bill No. 56–91 be amended by eliminating everything after its title and substituting the boundaries of the Commission's redistricting plan, except for an amendment moving precincts 9–22 and 9–23 from District II to District III. At this same November 7 meeting, Councilmember Leggett proposed that the Darnestown change, which he had described two days before, also be incorporated into a redistricting plan by amending "the bills [56–91 and 57–91] introduced today."

On November 24, 1991, at least five of the Democratic members of the County Council attended a meeting called by the local Democratic Central Committee (DCC). The DCC invited all of its members and all Democratic elected officials in Montgomery County to this meeting. As was the general rule in all of its meetings, the DCC did not open this meeting to the public. A variety of topics were discussed at the meeting, including party financial issues and party organization; redistricting at the federal, state, and local levels was also discussed. Council President Leggett was asked to brief those at the meeting on the various councilmanic redistricting plans before the County Council. When this briefing was ended, there was discussion of how the plans met the objectives of the DCC, *i.e.*, creating an up-county district, keeping communities intact, and not dividing the County's minority populations. Apart from the introductory briefing by Council President Leggett, there was no evidence that any member of the Council joined in this discussion. The DCC then voted to support adoption of the Commission plan. There was unre-

butted testimony that the decision to vote on this issue was made spontaneously during the meeting and that the meeting had not been called for the purpose of informing councilmembers of the DCC's views on redistricting or for the purpose of taking any vote on a redistricting plan. There was no evidence that any councilmember participated in the vote on the redistricting proposal.

On November 26, 1991 a public hearing was held on the Commission's redistricting plan. Prior to the hearing, it was advertised in a local newspaper on several occasions. One notice published in advance of the public hearing stated:

> [t]he Council will conduct a hearing on the proposed plan Report of the Commission on Redistricting, submitted under Section 104 of the County Charter, which recommends new boundaries for councilmanic districts. The Council by legislation may adopt boundaries different from those recommended by the Commission. Persons who wish to suggest modifications to the boundaries proposed by the Commission should do so at this hearing.

Another notice, also published in advance of the public hearing, stated:

> Bills 56–91 and 57–91, Councilmanic Districts, propose new boundaries for the five councilmanic districts required under the County Charter. These bills are alternatives to the Plan offered by the Commission on Redistricting. The Council may consider other boundaries than those proposed in Bills 56–91 and 57–91.

At the public hearing, the Council heard testimony as to the various redistricting proposals for more than two hours from numerous witnesses.

A week later, on December 3, 1991, the Council held a public work session. The information packets prepared for this work session, which were available to the public as well as the Council, indicated that there were several redistricting proposals before the Council. A memorandum, prepared by the Council's senior legislative attorney for the Council's use at the work session, stated that the Council had before it five

redistricting plans: the Commission's plan, original Bills 56–91 and 57–91, Councilmember Hanna's amendment to Bill No. 56–91, and a plan proposed by the Citizens Political Action Committee (CITPAC). The minutes from this work session state that it was agreed that Council staff was instructed that Bill No. 56–91 would be amended to reflect the proposed movement of precincts 9–22, 9–23 (Councilmember Hanna's proposal), and precincts 6–1, 6–5 (Council President Leggett's proposal); and Bill No. 57–91 would be amended to reflect CITPAC's suggested changes.

On December 10, 1991, the Council met in legislative session. The legislative packet prepared for the Council stated that there were four redistricting plans from which the Council could choose: (1) the Commission's plan; (2) Bill No. 56–91, amended to incorporate the proposed changes to precincts 9–22, 9–23, 6–1, and 6–6; (3) Bill No. 57–91, amended to incorporate the CITPAC plan; and (4) a plan proposed by Councilmember Ewing. The journal for that session shows that Councilmember Subin moved to adopt Bill 56–91 "as previously amended to incorporate the proposal developed by Councilmember Hanna"; his motion was seconded. Seven councilmembers voted to enact Bill No. 56–91 as amended; two councilmembers, Dacek and Krahnke, the original sponsors of Bill No. 56–91 prior to its amendment, voted against it. A map illustrating the boundaries of the redistricting plan adopted by the County Council is attached hereto as Appendix A.

One day before the Council's redistricting plan became effective, certain Montgomery County voters filed this action, seeking to have the plan declared a nullity. After months of pre-trial motions and discovery (one discovery dispute brought the case to this Court, *see Montgomery County v. Schooley,* 97 Md.App. 107, 627 A.2d 69 (1993)), a court trial was held on February 14–16, 1994. Following that trial, the circuit court delivered a lengthy oral opinion.

On appeal, the voters present these questions:

1. Is a private meeting of a quorum of the County Council with a special interest group for the purposes of discussing pending legislation at which the interest group votes and communicates its legislation preference prohibited by the Open Meetings Act?

2. When the County Charter requires that the "Council shall enact legislation only after public hearing on reasonable notice," is a substantive amendment validly enacted in the absence of further public notice or hearing, and must legislation be in writing and enacted only as provided by the Rules adopted at the command of the County Charter?

3. If no additional public hearing is generally mandated before adoption of substantively amended or replacement legislation, is notice and a hearing required in the case of reapportionment legislation or any legislation affecting "fundamental rights," and, if so, does its omission constitute a denial of due process, a denial of equal protection and an interference with freedom of association?

4. Does Montgomery County Charter Section 104 unconstitutionally delegate authority to legislate Councilmanic reapportionment in an appointed, unsworn Commission composed entirely of unelected citizens, when the elected legislators can only void the "Commission law" by mustering their own majority to enact a different plan within a specified, fail-safe period[?]

5. Do all of the circumstances under which reapportionment of the County Council occurred constitute an unlawful political gerrymander by means of the delineation of non-compact districts in violation of the County Charter?

We consider each question in turn but combine our discussion of questions 2 and 3.

(ii)

██ Appellants' initial argument is that, when "[o]n November 24, 1991, two days before the scheduled public hearing [on

councilmanic redistricting], a quorum of the County Council [at least five members, see Rule 1(c)(3) of Council Rules of Procedure] met to discuss, debate, and deliberate upon councilmanic redistricting" at a private meeting of the DCC, the Open Meetings Act was violated.

The Open Meetings Act, codified at Md.Code (1984, 1993 Repl.Vol., 1993 Cum.Supp.) §§ 10–501 to 10–512 of the State Gov't Article, requires that when a public body "meets" to carry out a "legislative function" it must (1) "meet in open session," *i.e.*, "the general public is entitled to attend," *id.* §§ 10–505 & 10–507(a); (2) give "reasonable advance notice of the session," *id.* § 10–506(a); and (3) follow a specified procedure if it wishes to close a meeting. *Id.* § 10–508(d). A public body meets when it "*convene[s]* a quorum . . . *for* the consideration or transaction of *public business.*" *Id.* § 10–502(g) (emphasis added). A "[l]egislative function," is, *inter alia,* "approving, disapproving, enacting, amending, or repealing a law or other measure to set public policy." *Id.* § 10–502(f)(1). The Act specifically provides that its requirements do not apply to "a chance encounter, social gathering, or other occasion that is not intended to circumvent" its requirements. *Id.* § 10–503(a)(2). Only "if [a] court finds that a public body *willfully* failed to comply with § 10–505, § 10–506, § 10–507 or § 10–509(c) of this subtitle and that no other remedy is adequate, [may a court] declare void the final action of the public body." *Id.* § 10–510(d)(4) (emphasis added). "In an action under this section, it is presumed that the public body did not violate any provision of the subtitle, and the complainant has the burden of proving the violation." *Id.* § 10–510(c). With these principles in mind, we turn to the facts of appellants' claim.

All evidence as to the impetus for, purpose of, discussion, and vote at the DCC meeting came from the trial testimony of two witnesses called by the voters—Michael Gildea, the then Chairman of the DCC, and David Naimon, another member of the DCC. Neither witness clearly remembered the meeting, which, of course, had occurred more than two years earlier. They testified, however, without contradiction from any other

witness, that: (1) the meeting was initiated by a DCC invitation to its members and all elected Democratic officials in the county; (2) this meeting was a regular "Liaison 2" meeting (liaison between DCC and all local elected officials) and such meetings are held once or twice a year; (3) the "purpose" of the meeting was to discuss "party organization, party financial issues and, in this case, the question of redistricting ... at the Congressional, State, and Council levels;" (4) forty to fifty people attended the two hour meeting at which approximately 20–25 minutes was devoted to discussing redistricting; (5) Mr. Gildea asked Council President Leggett "to do a summation of the [councilmanic redistricting] plans that were being considered;" (6) there was no discussion by any of the councilmembers of "their own individual preference for a particular plan;" (7) no vote on the redistricting plan had been scheduled but that such a vote was suggested at the meeting by a state legislator; (8) before the vote, Mr. Gildea explained to those assembled that the vote was to indicate the "sense of the group ... about our position" and the councilmembers "shouldn't be voting on this issue;" and (9) a voice vote or show of hands was then taken, in which neither witness believed any of the councilmembers had participated.

After considering this evidence, the circuit court found:

I find there was no vote there. That there is no testimony—there is really a paucity from people who were there about what really happened there. The ones who were called to testify can't remember or don't remember very well.

That is not—I don't fault them for that. It is a long time ago. Nobody thought they would be called to answer for what happened at that meeting. In the general raucous political meetings that we have nobody is really sure exactly what happened.

. . . .

Everybody agrees that [Mr. Leggett] was the one who explained the bill. There was no deliberation among the

County Council members. There is no evidence that any County Council members spoke to any other County Council member.

There is no evidence that any County Council member took a position that would have been known by anyone there, much less one of the other County Council members. I find that this was not a subterfuge. That this was not a meeting to deliberate and decide.

. . . .

The issue is this was not a dodge or subterfuge.... It wasn't done with deliberation to evade the law.

In fact, there is no evidence that the law in fact was evaded. The proof in many ways is in the pudding, because there was a later hearing. There was deliberation. There was amendment to the bills presented.

If the Court were to rule otherwise, I think there would be a real question about infringing on the rights of people to gather together and listen to views. The rights of, which all of us what (sic) to protect, of citizens to make their views known to the elected representatives.

While we want to have public hearings, there is no bar, and there never has been a bar, to individual citizens or even groups of citizens meeting outside a public hearing, the context of a public hearing, or a session of the council, to present their views to an elected member of the County Council.

I don't think the Court should change that. This case certainly doesn't give the Court a factual basis upon which to question what happened insofar as a violation of the Open Meetings Act.

I find there was no violation of the Open Meetings Act.

■ As our detailed outline of the evidence set forth above indicates, these findings are amply supported by the record. Curiously, appellants do not even directly assert to the contrary. Instead, they simply reargue the admittedly undisputed facts and the inferences that could arguably be drawn from

them and urge us to come to a different conclusion, *i.e.,* the Public Meetings Act was violated. That, however, is not our function. Indeed, when, as here, "an action has been tried without a jury" an appellate court "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md.Rule 8–131(c). The circuit court's findings in this case were not clearly erroneous.

Nor, in light of these facts, were the circuit court's legal conclusions incorrect. In *City of New Carrollton v. Rogers,* 287 Md. 56, 410 A.2d 1070 (1980), the Court of Appeals held that a meeting of a quorum of the New Carrollton City Council and the city's Mayor with a civic association to discuss the city's decision as to whether to annex certain property did not violate what was then known as the "Sunshine Law," even though only very minimal public notice was given of the meeting. *Id.* at 58, 62, & 73, 410 A.2d 1070. The Court explained that "the evidence failed to establish a violation," *id.* at 73, 410 A.2d 1070, and that there was nothing

> ... sinister or illegal about the invited attendance of the Mayor and members of the Council at the August 7, 1978 meeting in West Lanham Hills for the purpose of answering questions that the residents might have about New Carrollton. Public notice of this event was not required by the Act to be given to the citizens of New Carrollton since, as we view it, it was not a "meeting" of the public body but rather, within the contemplation of § 8(f), was an "[occasion] ... not designed or intended for the purpose of circumventing the provisions of this subtitle."

*Id.* at 71, 410 A.2d 1070. Appellants seek to distinguish *New Carrollton* because there, prior to the vote by the City Council on the annexation resolution, city officials did give the public "proper notice" and "the right to attend" other annexation meetings. Precisely the same thing can be said about the case at hand, *i.e.,* it was undisputed that prior to the vote on redistricting the public was given proper notice and the right to attend public Council-convened meetings on this subject.

Moreover, the out-of-state cases upon which appellants rely do not assist them here. Those cases were decided pursuant to quite different statutes (there is no uniform public meetings act). Perhaps most significantly, there is no provision in those statutes similar to § 10–510(d)(4). This portion of the Maryland statute permits a court to declare the final action of a public body void for certain violations of the Open Meetings Act only if the court finds the public body "willfully" failed to comply with the Act and that no other remedy is adequate. "Willfullness" is not a criterion for determining whether there has been a violation of the Act and so does not distinguish the Maryland law from that of other states on that issue. Section 10–510(d)(4) is significant, however, because even if a public body is found to violate the Act, this statute prevents a court from declaring void the final action (like the redistricting plan) of that body, unless the court finds that the public body "willfully" failed to comply with the Act. There was, of course, no such finding here.

Furthermore, all the out-of-state cases on which appellants rely involve either (1) the meeting of a body that was created by and found to be "an arm of" a public body, *e.g., Town of Palm Beach v. Gradison,* 296 So.2d 473, 476 (Fla.1974), or (2) situations where the *purpose* of the challenged meeting was expressly found to be to conduct public business. Often, in the latter situation, the meeting was initiated by public officials, either immediately before or immediately after a public meeting, to plan strategy for enactment of public business. *See Sacramento Newspaper Guild v. Sacramento County Bd. of Supervisors,* 263 Cal.App.2d 41, 69 Cal.Rptr. 480, 483, 487 (1968) (meeting of five county supervisors, county counsel, county executive, county director of welfare, and union officials to discuss "a strike . . . against the county and [its] effort to enforce an injunction secured in connection with the strike" was "designed for the discussion of public business" and so covered by California's public meeting law known as the "Brown Act"); *People ex rel. Difanis v. Barr,* 83 Ill.2d 191, 46 Ill.Dec. 678, 414 N.E.2d 731, 733, 735 (1980) (party caucus meeting of nine members of city council held at one member's

house one and one-half hours prior to council's public meeting at which members discussed matters the city council would consider at its meeting later that night "concerned public business" that was "scheduled to be dealt with [officially] that very evening" and so was covered by the Illinois Open Meetings Act); *Sciolino v. Ryan*, 81 A.D.2d 475, 440 N.Y.S.2d 795, 796–98 (1981) (meeting of majority party members of city council, immediately prior to public meetings, to "receive[ ] information relating to city government matters likely to come before the entire Council, and discuss[ ] such matters" when "[t]he frequent result of these discussions are decisions to include or not to include an item on the agenda of the regular public Council meeting" was conduct of public business covered by the New York Open Meetings Law); *State ex rel. Newspapers, Inc. v. Showers*, 135 Wis.2d 77, 398 N.W.2d 154, 156 (1987) (a meeting of four members of sewerage commission, following a public meeting of the commission, to "discuss the operating budget and the capital budget" when the four, voting together, had "the power" to "block the adoption of any proposed budget" had as its purpose "engag[ing] in public business" and so was covered by the Wisconsin Open Meeting Law).

In contrast, here the circuit court expressly found that there was no "vote," or "deliberation" by councilmembers, no "meeting to deliberate and decide," no intention to "evade the law," "no evidence that the law was in fact evaded," and no "factual basis" for a finding of violation of the Maryland Open Meetings Act. On similar facts, courts in other states, albeit interpreting different statutes, have also concluded that open meetings laws were inapplicable. *See, e.g., Nabhani v. Coglianese*, 552 F.Supp. 657, 661 (N.D.Ill.1982) (political meeting attended by all members of school board in which "[t]here was no examining or weighing of reasons for or against a course of action, no exchange of facts preliminary to a decision, no attempt to reach accord on a specific matter of school district business" was not covered by Illinois Open Meetings Act); *Stevens v. Bd. of County Comm'rs of Reno County*, 10 Kan. App.2d 523, 710 P.2d 698, 699, 700 (1983) (recess meeting of

board of county commissioners in which "[s]everal items of county business were informally discussed by those present" was not a "public meeting" because the recess was not "prearranged" but "was declared spontaneously because of a lack of business and was not preplanned in any way" and so was not covered by the Kansas Open Meetings Act); *Beckham v. City of Bowling Green,* 743 S.W.2d 858, 861 (Ky.Ct.App.1987) ("[a]lthough a quorum of the [city] commissioners may have discussed the issue among themselves at a gathering other than a regular meeting, the trial court specifically found that no secret meetings were held in violation of the [Kentucky] Open Meetings Act" and this finding was not "clearly erroneous"); *Moberg v. Indep. Sch. Dist.,* 336 N.W.2d 510, 518 (Minn.1983) (meeting of quorum of school board "in the superintendent's office shortly before a regular Board meeting" in which the superintendent distributed written copies of questions and answers and invited Board members' response was not a meeting covered by Minnesota Open Meeting Law); *Harris v. Nordquist,* 96 Or.App. 19, 771 P.2d 637, 640–41 (1989) (gathering of quorum of school board members at restaurant before and sometimes after official public meetings in which "they sometimes discussed 'what's going on at the schools'" was not a public meeting covered by the Oregon Open Meetings Law because "[i]nformation gathering is distinct from deliberating.").

In sum, with regard to the Open Meetings Act claim, the circuit court's factual findings were not clearly erroneous and its legal conclusions were correct.

### (iii)

■ The voters next argue that the Council in enacting a redistricting plan violated the Council's procedural rules, rules that were required by the County charter; the voters assert that these violations require invalidation of the redistricting plan.

The Maryland Constitution provides: "[T]he title or a summary of all laws and ordinances proposed shall be published once a week for two successive weeks prior to enactment...."

Md. Const. art. XI–A, § 3. The County Charter similarly provides that the "Council shall enact legislation only after public hearing upon reasonable notice" and that "[a]ll legislation shall be published as required by the Constitution and laws of Maryland. In addition, a summary of any legislation, except emergency legislation, enacted by the Council shall be published prior to the date it becomes effective, in such manner as the Council shall prescribe by law." Montgomery County Charter art. 1, §§ 111, 113. The Charter further provides that the "Council shall ... prescribe its rules of procedure and provide for the publication of its proceedings." *Id.* § 116. Rule 6(d) of the Council's Rules of Procedure, enacted pursuant to this Charter provision, states: "Amendments to legislation that are to be the subject of an advertisement and a public hearing, must be proposed in legislative session, and must be reduced to writing before advertisement." Finally, Rule 1 of those rules provides, "A Council action that is otherwise valid is not invalid because of any failure to follow these rules."

Appellants' argument that the charter and rules were violated is based on four facts: (1) prior to the December 10 meeting at which it enacted a redistricting plan, Councilmember Hanna's amendment to Bill No. 56–91, involving precincts 9–22 and 9–23, was described only orally and in a four line memorandum; (2) prior to that meeting, the Darnestown precinct changes (6–1 and 6–5) suggested by Councilmember Leggett were described only orally; (3) neither the Hanna amendment nor the Leggett amendment was publicly advertised or publicly "heard"; and (4) both amendments were introduced and enacted at the December 10 meeting. These facts are undisputed. It is equally undisputed, however, that: (1) several notices of public hearing on the redistricting plan were published in a local newspaper of general circulation; (2) these notices clearly stated not only that the Council would conduct a hearing on the Commission's redistricting plan but also that the Council "by legislation may adopt boundaries different from those recommended by the Commission," that "[p]ersons who wish to suggest modifications to the bound-

aries ... should do so at this hearing" that "Bills 56–91 and 57–91 ... propose new boundaries for the five councilmanic districts," which "are alternatives to the" Commission Plan, and that the Council "may consider other boundaries than those proposed in Bills 56–91 and 57–91"; (3) both the Leggett and Hanna proposals were discussed at public Council meetings prior to the December 10 vote; and (4) the information packets available to the public prior to those meetings state that these proposals were under consideration.

On the basis of this evidence, the circuit court found:

What is the purpose of advertising? The purpose of advertising is to put the public on notice as to what business is coming before the County Council. If this Court were to adopt a rule as suggested by the plaintiffs, that every amendment ... would have to be in writing and be advertised.

We couldn't get the public business done. These rules and the charter provisions are really rules of reason. The charter sets up standards that have to be kept.... The Court finds that the advertisement that was in fact—the two advertisements that were placed in the paper were advertisements of the council's consideration of a redistricting plan.

Bill 56–91, its title was advertised. As long as the amendments, even if they are wholesale and change the whole bill, as long as they continue to cover the subject of redistricting, then to this Court's mind the thrust and the purpose of the advertising rule is met, that the public will understand that redistricting is going to be considered....

There is no rule that requires any amendment to be advertised unless the amendment is going to be the subject of a public hearing. If the amendment is not the subject of a public hearing, rule 6D doesn't apply to it.

The Court finds that 6D does not apply. That there can be amendments that are not the subject of advertising, reasonably, and this is one. These amendments did not in

any way change the nature of the task before the County Council....

Again, we cannot conclude that these findings were clearly erroneous. Rather, like the findings as to the public meeting law claim, these findings are amply supported by evidence in the record. Moreover, once again, in view of the facts found by the circuit court, its legal conclusions are unassailable. First, of course, Rule 1 specifically provides that violation of any of the Council rules does not invalidate otherwise valid Council action. Thus, even if there were a violation of Council rules, those very rules expressly state that the violation does not invalidate enactment of the redistricting plan.

 Furthermore, examination of relevant legal authority leads to the conclusion that there was no violation here. It is quite true, as appellants assert, that when an amendment to legislation is "material" it "has been ruled" that it will be subjected to the rules governing legislation. *See* 5 Eugene McQuillen, et al. *The Law of Mun. Corps.* § 16.87 (3d ed. rev. 1989). It is equally true, however, that "[n]ot every amendment is required to be published" and that determining whether an amendment substantially or materially alters legislation so as to require its publication or a public hearing on it is a "mixed question of law and fact." *Wollen v. Borough of Fort Lee*, 27 N.J. 408, 142 A.2d 881, 887 (1958). *See also Farnsley v. Henderson,* 240 S.W.2d 82, 84 (Ky.1951) (stating that "[w]hat constitutes a material or substantial change in an ordinance ... is dependent upon the circumstances of each case.")

 Unless a county charter, ordinance, or rule specifically provides to the contrary, "only those changes to an ordinance so substantial as to change its basic character" are regarded as material enough to "require that the public hearing process be repeated." *Liberati v. Bristol Bay Borough,* 584 P.2d 1115, 1119 (Alaska 1978). An "amended ordinance cannot be deemed to be a new or different one unless it enlarges or narrows the scope of the original instrument to such an extent that the ordinance as enacted can be said to be

misleading in a substantial manner in its final form." *Farnsley,* 240 S.W.2d at 84. Amendments that do "not defeat the original purpose [of the ordinance] ... [are] not so substantial as to become a new ordinance." *B & B Vending Co. v. City of El Paso,* 408 S.W.2d 545, 548 (Tex.Civ.App.1966). Indeed, even if an amendment does materially or substantially alter legislation, if "such changes are germane to and within the scope of the original subject of the ordinance as expressed in its title," as the challenged amendments here were, then the validity of the enactment of the amended legislation has been upheld. *See Metropolitan Gov't of Nashville & Davidson County v. Mitchell,* 539 S.W.2d 20, 22 (Tenn.1976).

When, again as here, the amendments "are squarely within the descriptive summary of the ordinance [that was] published" this is regarded as a clear indication that they are not substantial or material enough to require that the publication or public hearing process be repeated. *Liberati,* 584 P.2d at 1119; *see also Heaton v. City of Charlotte,* 277 N.C. 506, 178 S.E.2d 352, 359–60 (1971) ("additional notice and public hearing ordinarily will not be required when the initial notice is broad enough to indicate the possibility of substantial change and substantial changes are made of the same fundamental character as contained in the notice and such changes resulted from discussion and debate at the hearing").

Another factor that has been examined "in determining whether an amendment to a proposed ordinance is such as to require a new public hearing is whether a significant added burden has been placed on those challenging it." *Liberati,* 584 P.2d at 1119 n. 13; *see also Heaton,* 178 S.E.2d at 359. There is no evidence that the amendments challenged here in any way imposed any additional burden on the plaintiffs. Four plaintiffs testified at trial in this case: Mary Ann Thane, William Roberts, James Schooley, and David Gardner. Not one of them suggested that the Hanna amendment, involving precincts 9–22 and 9–23, or the Leggett amendment, involving precincts 6–1 and 6–5, in any way burdened, or even affected, them. Rather, all four stated that the Hanna amendment did

not *in any way* affect their views of the redistricting plan. Mr. Gardner stated that the Leggett proposal similarly did not affect his views on the plan; the other three plaintiffs conceded that the Leggett amendment was a "positive change" to the plan, *i.e.*, it improved the plan. Accordingly, because there is no evidence in this record that the amendments appellants complain of in any way adversely affected them, no new notice or hearing was required. *See Wollen,* 142 A.2d at 888; *Inganamort v. Borough of Fort Lee,* 120 N.J.Super. 286, 293 A.2d 720, 725 (Law Div.1972), *aff'd,* 62 N.J. 521, 303 A.2d 298 (1973).

In sum, with regard to the asserted procedural violations, the circuit court's factual findings are not clearly erroneous, nor are its legal conclusions incorrect. Moreover, the propriety of these findings and conclusions is not in any way diminished because a redistricting plan is the subject of the challenged amendments. Appellants' argument to the contrary, *i.e.*, that even "[i]f no additional public hearing is generally mandated ... notice and a hearing [is] required in the case of reapportionment legislation" because it affects "fundamental rights," is meritless.

Of course, as appellants suggest, the right to vote is a fundamental right protected by the First Amendment and so asserted infringements of it are subjected to strict scrutiny and must serve a compelling governmental interest. *See, e.g., Bullock v. Carter,* 405 U.S. 134, 142–43, 92 S.Ct. 849, 855–56, 31 L.Ed.2d 92 (1972); *Reynolds v. Sims,* 377 U.S. 533, 562, 84 S.Ct. 1362, 1381–82, 12 L.Ed.2d 506 (1964). Appellants, however, have not cited any case that has held that legislation involving the process of adoption of "reapportionment legislation" impairs the right to vote and so is subject to strict scrutiny. There is, in fact, substantial authority to the contrary. Indeed, it is crystal clear that "[w]hile ... the right to vote is fundamental ... the constitutional interest allegedly impaired [by a redistricting plan] is not the right to vote per se," and is not a "fundamental right." *Kenai Peninsula Borough v. State,* 743 P.2d 1352, 1371–72 (Alaska 1987). *See*

*also Republican Party of Oregon v. Keisling,* 959 F.2d 144–45 (9th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 1952, 118 L.Ed.2d 555 (1992); *Mirrione v. Anderson,* 717 F.2d 743, 745 (2d Cir.1983), *cert. denied,* 465 U.S. 1036, 104 S.Ct. 1308, 79 L.Ed.2d 706 (1984); *Wolfson v. Nearing,* 346 F.Supp. 799, 803 (M.D.Fla.1972); *Bay Ridge Community Council, Inc. v. Carey,* 103 A.D.2d 280, 479 N.Y.S.2d 746, 749 (1984), *aff'd,* 66 N.Y.2d 657, 495 N.Y.S.2d 972, 486 N.E.2d 830 (1985). Rather, voting is a personal right. *Reynolds,* 377 U.S. at 561, 580, 84 S.Ct. at 1391; *Mirrione,* 717 F.2d at 745. In the "absence of invidious discrimination," there is no right of "voters of a city, town, or geographic or ethnic community ... to be grouped together in a single election unit." *Mirrione,* 717 F.2d at 745. *See also Wolfson,* 346 F.Supp. at 803; *Bay Ridge,* 479 N.Y.S.2d at 749.

For all of these reasons, we must reject appellants' claim that procedural irregularities require invalidation of the councilmanic redistricting plan.

(iv)

 Section 104 of the County Charter, which establishes the Redistricting Commission, whose redistricting plan automatically becomes law if the County Council fails to adopt its own redistricting plan, is challenged by appellants as an unconstitutional delegation of legislative power in violation of Art. III, § 33 of the Maryland Constitution. Appellants also maintain that the fact that members of the Redistricting Commission did not subscribe to an oath violated Art. I, § 9 of the State Constitution.

Because the County Council adopted its own redistricting plan in a timely manner, the Commission's plan never became law "by default" pursuant to § 104's deadline; the circuit court, therefore, declined to reach these issues. It reasoned:

... it is not the function of judges to step in and declare statutes, rules, or regulations, or laws, unconstitutional, or charters unconstitutional, unless they absolutely have to.

> I find that in fact what the [councilmembers] did was in accordance with Section 104 of the charter. They adopted a bill. So it makes moot any possible unconstitutional delegation. I don't reach that issue.
>
> Nor do I reach the issue about whether the members were sworn or not. We can leave that for another day....

Appellants assert that the circuit court erred in refusing to reach the delegation and oath issues because the Commission was appointed, held public hearings, proposed a plan, and the plan ultimately enacted by the County Council was a "fingerprint image" of the Commission's plan. This argument seems rather strange in view of appellants' vigorous assertions, discussed in part iii *supra*, that the Council substantially and materially amended the Commission's plan. In any event, the argument is meritless. As the Court of Appeals explained when it recently rejected a similar delegation claim in the context of a challenge to the State's legislative redistricting plan, when the legislature "passes a bill which becomes law, the people of Maryland [or Montgomery County] have articulated a legitimate state [or county] policy through their duly elected officials" even if that law is developed by another body, and the legislature merely "reject[s] or endorse[s]" the work of that body. *Legislative Redistricting Cases*, 331 Md. 574, 595 n. 16, 629 A.2d 646 (1993). Thus, once the County Council enacted its own plan, even if very similar to the Commission's plan, the Council had spoken and the Commission plan was of no effect.

Accordingly, it seems to us that the lower court was entirely correct in declining to reach the delegation or oath issues. There is, as the circuit court noted, a strong judicial disposition not to reach a constitutional claim unless required to do so. *See, e.g., State v. Lee*, 330 Md. 320, 329, 624 A.2d 492 (1993) ("[t]his Court will not decide a constitutional issue except when the necessity to do so arises from the record before it."). When, as here, a decision as to a constitutional claim is not necessary to the resolution of a case, the Court of Appeals has consistently held that the proper course is to refuse to reach that claim. *See, e.g., Comm'r of Labor &*

*Industry v. Fitzwater*, 280 Md. 14, 19, 371 A.2d 137 (1977) (trial court erred when it reached constitutional question that could have been avoided by relying on non-constitutional grounds); *Tauber & Gould v. Montgomery County Council*, 244 Md. 332, 338, 223 A.2d 615 (1966) (declining to decide prematurely presented question of county ordinance's constitutionality when not required for resolution of case). We believe that approach was appropriate here.

(v)

The final challenge posed by the voters is the only one that addresses the features of the redistricting plan itself. Much of appellants' argument on this final claim is devoted to renewing their earlier open meetings, procedural violations, and delegation claims. Moreover, although appellants repeatedly note that the redistricting plan that was adopted "resulted in increased population variance as compared to significantly lower levels of variance in every other plan" (the maximum variance among the districts in the plan that was adopted was 5.51%, versus 3.07% in the Commission's proposal and 1.82% in the Dacek–Krahnke plan), they expressly and properly concede that the plan that was adopted provides for councilmanic districts "within permissible population variances." When this is so, the fact that "the districts could have been made more equal is simply irrelevant." *Legislative Redistricting Cases*, 331 Md. at 596, 629 A.2d 646. Furthermore, appellants make no claim that the plan is non-contiguous or discriminates against any racial or ethnic group. Thus, the voters' sole quarrel with the redistricting plan itself is that it "constitute[s] an unlawful political gerrymander by delineation of non-compact districts." In other words, they assert that the plan: (a) is not compact and (b) constitutes a political gerrymander. We shall address each of these arguments in turn.

(a)

Prior to the enactment of the 1991 councilmanic redistricting plan, Montgomery County's more sparsely populated

northern portion, *i.e.*, up-county, was divided between two elongated councilmanic districts on a north-south axis. The councilmember from each of these districts lived in the more populated southern, down-county, portion of the district. The Chairman of the Redistricting Commission testified at trial that, at the Commission's public meetings, many persons stated that the new districts should be drawn so that any councilmember representing the more rural up-county area actually lived there. Up-county voters believed that only a representative who lived among them could understand their problems, *i.e.*, those of persons living in a rural area, which has experienced growth and so needs new schools, roads, etc., but who wish to avoid becoming a dumping ground for all County incinerators and landfills. This view, although vigorously raised ten years ago was rejected then. Following the 1990 census, however, the Redistricting Commission was persuaded by these arguments and determined to create an up-county district if consistent with constitutional requirements. The County Council was apparently also persuaded by these arguments; the plan it ultimately enacted similarly created one large up-county district, District II, and four down-county districts, Districts I, III, IV, and V. *See* Appendix I. All of the down-county districts are appreciably smaller in area than the up-county district. *Id.* The crux of appellants' compactness claim seems to be that this is not permissible under the charter mandate that "[e]ach district shall be compact in form." Montgomery County Charter art. 1, § 103.

■ The Court of Appeals has twice applied an identical compactness requirement, contained in Article III, § 4 of the Maryland Constitution ("[e]ach legislative district shall ... be compact in form...."), for State legislative districts. Md. Const. art. III, § 4. *See Legislative Redistricting Cases,* 331 Md. at 590–92, 629 A.2d 646; *In re Legislative Districting,* 299 Md. 658, 475 A.2d 428 (1982). It has recognized that although "the ideal of compactness, in geometric terms, is a circle, with the perimeter of a district equidistant from its center," no state "[w]ith the possible exception of Colorado ... has defined or applied the compactness requirement in geometric

terms." 299 Md. at 676, 475 A.2d 428 (citations omitted). The Court of Appeals has thus acknowledged that compactness is a relative concept and has examined numerous cases from other jurisdictions so holding. *Id.* at 676–80, 475 A.2d 428. Review of the principles set forth in those cases is unnecessary here because appellants do not assert the sort of compactness challenge addressed in those cases, *i.e.*, that the challenged district is a bizarre or outrageous shape. *See Shaw v. Reno,* 509 U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (challenged district was 160 miles long and often less than a quarter of a mile wide). In fact, the actual shape of the up-county district, District II, is neither bizarre nor outrageous; indeed, it has fewer irregularities, nooks, crannies, or "fingers" than any of the down-county districts.

Appellants' compactness claim, that District II is not compact simply because it is larger in area than the other districts, appears to be unique. The circuit court rejected this claim. There seems to be no legal support for it. We have examined all of the compactness cases cited by the parties and numerous others and have not found a single case holding that a district is not compact just because it is larger than other districts. Moreover, examination of the maps of the statewide redistricting plan, which was upheld in 1982 as sufficiently compact, strongly indicates that such a claim is not tenable. *See* 299 Md. at 694–96, 475 A.2d 428. In the 1982 plan, Legislative Districts 28, 36, 37, and 38 each had appreciably more geographic area than any other legislative district in the State. *Id.* at 694, 475 A.2d 428. Legislative District 15 was much larger than any other Montgomery County district; Legislative District 27 was much larger than any other Prince George's County legislative district. *Id.* at 695, 475 A.2d 428. Furthermore, Legislative Districts 46 and 47 were appreciably larger than any other Baltimore City districts, *id.* at 693, 475 A.2d 428, although, of course, all Baltimore City districts were a great deal smaller than the legislative districts in all other portions of the State. *Id.* at 694, 475 A.2d 428. Accordingly, appellants' compactness claim is meritless.

(b)

■ Appellants' assertion that the redistricting plan "constitutes an unlawful political gerrymander" is based on the fact that the plan places both incumbent minority party (Republican) councilmembers in the same district and creates a district with no incumbent, while all majority party (Democrat) incumbents are protected, *i.e.,* placed in different districts.

■ As the Supreme Court has long recognized, "[p]olitics and political considerations are inseparable from districting and apportionment.... District lines are rarely neutral phenomena.... The reality is that districting inevitably has and is intended to have substantial political consequences." *Gaffney v. Cummings,* 412 U.S. 735, 753, 93 S.Ct. 2321, 2331, 37 L.Ed.2d 298 (1973). Although, as appellants assert, political gerrymandering is "justiciable" under the federal equal protection clause, such a claim can succeed only if there is proof of: (1) discrimination against an identifiable political group *and* (2) an actual discriminatory effect on that group. *See Davis v. Bandemer,* 478 U.S. 109, 138–39, 106 S.Ct. 2797, 2813, 92 L.Ed.2d 85 (1986). The circuit court recognized that *Davis* establishes a "very heavy burden" and found that appellants had not "carried" that burden.

■ An examination of the *Davis* principles makes that conclusion inescapable. The Supreme Court explained in *Davis:*

> [E]ven if a state legislature redistricts with the specific intention of disadvantaging one political party's election prospects, we do not believe that there has been an unconstitutional discrimination against members of that party *unless the redistricting does in fact disadvantage it at the polls.* Moreover, ... *a mere lack of proportionate results in one election cannot suffice in this regard* ...

478 U.S. at 139, 106 S.Ct. at 2813 (emphasis added). Thus, a plaintiff may not simply rely on the results of a single election to demonstrate that an asserted political gerrymander has an actual discriminatory effect.

*Republican Party of Virginia v. Wilder,* 774 F.Supp. 400 (W.D.Va.1991) is instructive. There a group of Republicans asserted that the Virginia legislative redistricting plan constituted an unlawful political gerrymander because it paired fourteen Republican incumbents with each other in seven districts and paired one Republican incumbent with an independent in another district, while only two incumbent Democrats were paired. A three-judge federal court rejected the claim, specifically noting that because there had been no election under the new plan, there was insufficient evidence to establish that "the electoral system has been 'arranged in a manner that will *consistently* degrade a voter's or group of voters' influence on the political process as a whole.'" *Id.* at 405 (quoting *Davis,* 478 U.S. at 142–43, 106 S.Ct. at 2815) (emphasis added). *Davis* commands the same result here where there has also been not even one election under the challenged redistricting plan.

### (vi)

Redistricting is both an art and a science; it is by its very nature founded on compromise and accommodation. Constitutional requirements are, of course, of paramount importance but when those requirements can be met in a number of ways, consideration of the legitimate desires of those being redistricted is entirely appropriate. The Montgomery County councilmanic redistricting process and the plan ultimately formulated pursuant to it, while by no means perfect, are in many respects praiseworthy.

The bipartisan Redistricting Commission, with its knowledgeable chair, held numerous public meetings in different communities throughout the County and a televised public hearing, giving every interested person an opportunity to be heard. The plan it proposed to the County Council complied with all constitutional requirements and sought mightily to accommodate the legitimate non-constitutional concerns of county voters. Following advertisement, the County Council held several public sessions at which the Commission's plan and alternatives to it were considered and interested persons

were given an opportunity to share their opinions on the various redistricting proposals. Although attendance of some of the councilmembers at the closed DCC meeting, in which a straw vote on redistricting proposals was taken just a few days before one of the Council's public sessions, was in retrospect perhaps unwise, there is no evidence that the councilmembers knew that a straw vote would be taken, participated in that vote, or in any way intentionally violated any portion of the Open Meetings Act. The redistricting plan, which was timely enacted by the County Council, like the Commission's plan on which it was largely based, complied with all constitutional requirements and accommodated legitimate non-constitutional concerns of many county voters.

Nevertheless, appellants' legal challenge to the plan was marked by creativity and vigor, if not substantive merit. Such interest in, and concern for, the political process is commendable. The Council's highly professional defense of its plan is equally commendable. Finally, Judge Ferretti carefully considered the evidence and arguments of counsel and then promptly issued a detailed oral opinion.

In sum, although no redistricting plan, or the process employed to develop such a plan, pleases every one, it seems quite clear to us that in this case the political and judicial system worked, and worked well. The judgment is affirmed, and the mandate will issue forthwith.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.

# APPENDIX A

COUNCILMANIC DISTRICTS AND PRECINCTS
ADOPTED BY THE COUNTY COUNCIL
12/10/91
Montgomery County, Maryland

North

County Council Modifications to
the plan submitted by the Redistricting
Commission involving Precincts 6-1,
6-3, 9-22 and 9-23.